FILED
United States Court of Appeals
Tenth Circuit

March 27, 2019

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JOHN TEETS,

     Plaintiff - Appellant,

v.

GREAT-WEST LIFE & ANNUITY
INSURANCE COMPANY,

     Defendant - Appellee,

------------------------------

AARP; AARP FOUNDATION;
AMERICAN COUNCIL OF LIFE
INSURERS,

     Amici Curiae.

No. 18-1019

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:14-CV-02330-WJM-NYW)**
_____

Peter K. Stris, Stris & Maher LLP, Los Angeles, California (Rachana A. Pathak, John Stokes, Stris & Maher LLP, Los Angeles, California; Nina Wasow, Todd F. Jackson, Feinberg, Jackson, Worthman & Wasow LLP, Oakland, California; Todd Schneider, Mark Johnson, James Bloom, Schneider Wallace Cottrell Konecky Wotkyns LLP, Emeryville, California; Scot Bernstein, Law Offices of Scot D. Bernstein, P.C., Folsom, California; Garret W. Wotkyns, Michael McKay, Schneider Wallace Cottrell Konecky Wotkyns LLP, Scottsdale, Arizona; Erin Riley, Matthew Gerend, Keller Rohrback LLP, Seattle, Washington; Jeffrey Lewis, Keller Rohrback LLP, Oakland, California, with him on the brief), for the Plaintiff - Appellant.

Carter G. Phillips, Sidley Austin LLP, Washington, D.C. (Michael L. O'Donnell, Edward C. Stewart, Wheeler Trigg O'Donnell LLP, Denver, Colorado; Joel S. Feldman, Mark B. Blocker, Sidley Austin LLP, Chicago, Illinois, with him on the brief), for the Defendant - Appellee.

William Alvarado Rivera, (Mary E. Signorille, AARP Foundation Litigation, Washington, D.C. with him on the brief) for AARP and AARP Foundation Litigation, Amici Curiae.

James F. Jorden, (Waldemar J. Pflepsen, Jr., Carlton Fields Jorden Burt, P.A., Washington D.C.; and Michael A. Valerio, Carlton Fields Jorden Burt, P.A., Hartford, Connecticut with him on the brief), for American Council of Life Insurers, Amicus Curiae.

Nancy G. Ross, Mayer Brown LLP, Chicago, Illinois, (Jed W. Glickstein, Mayer Brown LLP, Chicago, Illinois; Brian D. Netter, Mayer Brown LLP, Washington, D.C.; Steven P. Lehotsky, U.S. Chamber Litigation Center, Washington, D.C.; Janet M. Jacobson, Washington, D.C., with her on the brief), for the Chamber of Commerce of the United State of America and the American Benefits Council, Amici Curiae.

_____

Before **MATHESON**, **BACHARACH**, and **McHUGH**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

Great-West Life Annuity and Insurance Company ("Great-West") manages an investment fund that guarantees investors will never lose their principal or the interest they accrue. It offers the fund to employers as an investment option for their employees' retirement savings plans, which are governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.

John Teets—a participant in an employer retirement plan—invested money in Great-West's fund. He later sued Great-West under ERISA, alleging Great-West

2

breached a fiduciary duty to participants in the fund or that Great-West was a non-fiduciary party in interest that benefitted from prohibited transactions with his plan's assets.

After certifying a class of 270,000 plan participants like Mr. Teets, the district court granted summary judgment for Great-West, holding that (1) Great-West was not a fiduciary and (2) Mr. Teets had not adduced sufficient evidence to impose liability on Great-West as a non-fiduciary party in interest. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. **BACKGROUND**

Great-West is a Colorado-based insurance company that provides "recordkeeping, administrative, and investment services to 401(k) plans." Aplt. App., Vol. II at 149. It qualifies as a service provider—a "person providing services to [a] plan"—under ERISA. *See* ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

Mr. Teets participated through his employment in the Farmer's Rice Cooperative 401(k) Savings Plan ("the Plan"). Under the Plan, employees contribute to their own retirement accounts and choose how to allocate their contributions among the investment options offered. When employees invest in a particular fund, they become "participants" in that fund. Great-West contracts with the Plan and other comparable employer plans to offer the investment fund that is the subject of this case. Great-West is not in a contractual relationship with participants.

3

In this section, we first provide an overview of the ERISA legal framework governing this appeal. We then detail the factual background of the case and the proceedings in the district court.

## A. *Statutory Background*

### 1. ERISA Protections Against Benefit Plan Mismanagement

ERISA regulates employee benefit plans, including health insurance plans, pension plans, and 401(k) savings plans. It is a "comprehensive and reticulated statute, the product of a decade of congressional study of the Nation's private employee benefit system." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993) (quotations omitted). It governs employers that create and administer benefit plans as well as third parties that provide services for plans. S*ee* 29 U.S.C. § 1002(1), (4), (14), (16).

ERISA seeks to protect employees against mismanagement of their benefit plans. *See Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 15 (1987) ("The focus of the statute thus is on the administrative integrity of benefit plans."). "[T]o ensure that employees will not be left empty-handed," *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996), ERISA imposes fiduciary duties on those responsible for plan management and administration. *See* ERISA §§ 404, 406, 29 U.S.C. §§ 1104, 1106. "Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive." *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993) ("*Harris Trust*").

## 2. ERISA Fiduciaries

### a. *Establishing fiduciary status—named and functional fiduciaries*

Under ERISA, a party involved in managing a benefit plan takes on fiduciary obligations in one of two ways. *See In re Luna*, 406 F.3d 1192, 1201 (10th Cir. 2005). First, the instrument establishing a plan must specify at least one fiduciary—typically the employer or a trustee—that will have the "authority to control and manage the operation and administration of the plan." ERISA § 402(a), 29 U.S.C. § 1102(a). These are "named fiduciaries." *See Maez v. Mountain States Tel. & Tel., Inc.*, 54 F.3d 1488, 1498 (10th Cir. 1995) (defining "named fiduciary"). Second, a party not named in the instrument can nonetheless be a "functional fiduciary" by virtue of the authority the party holds over the plan. *See Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 837 (9th Cir. 2018) ("*Transamerica Life Insurance*"); *David P. Coldesina, D.D.S., P.C., Emp. Profit Sharing Plan & Tr. v. Estate of Simper*, 407 F.3d 1126, 1132 (10th Cir. 2005) ("*Coldesina*") (describing the "functional" approach to evaluating fiduciary status). Under § 3(21)(A) of ERISA,[1] a party becomes a functional fiduciary when

> (i) he *exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets*, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary

---

[1] We refer to the relevant portions of ERISA by the section number of the Act. ERISA is codified at 29 U.S.C. § 1001 et seq. We provide the corresponding U.S. Code sections for ease of reference.

authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (emphasis added).[2]

Functional fiduciaries' obligations are limited in scope: "Plan management or administration confers fiduciary status only to the extent the party exercises *discretionary* authority or control." *Coldesina*, 407 F.3d at 1132. And they must actually exercise their authority or control over the plan's assets.[3] *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 914 (7th Cir. 2013) (explaining that a decision not to exercise control over a plan's assets does not confer fiduciary status). Any alleged breach of a functional fiduciary's obligations must arise out of an exercise of that authority or control. *See id.* at 913; *Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 569 (7th Cir. 1991).

---

[2] Section 3(21)(A) lists three bases for a party to be a functional fiduciary. Because Mr. Teets rests his fiduciary status argument on only the first one, Aplt. Br. at 17, we have italicized that part of the provision here.

[3] ERISA § 3(21)(A) creates functional fiduciary status for those who exercise "discretionary authority or discretionary control" in the management of a plan or who exercise "authority or control" over plan assets. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Although only one of these clauses uses the modifier "discretionary," the parties use these phrases interchangeably and do not ask us to distinguish between them. *See* Aplt. Br. at 18 (stating both that "'to the extent' [Great-West] wields '*any* discretionary authority or discretionary control' over the plan or its assets, it owes fiduciary duties" and "[t]he 'authority or control' inquiry is complicated in many cases"); Aplee. Br. at 15 ("The test of Great-West's fiduciary status is whether Great-West exercises authority or control over a plan or plan assets . . . ."); Aplee. Br. at 31 ("Great-West's 'compensation' thus is not determined at its own discretion . . . ."). Because the parties do not argue otherwise, we assume without deciding that the difference in these clauses does not affect the functional fiduciary analysis in this case.

6

As the following discussion illustrates, although named fiduciaries and functional fiduciaries obtain fiduciary status in different ways, they are bound by the same restrictions and duties under ERISA.[4]

b. *Fiduciary duties and prohibited transactions*

Section 404 of ERISA imposes general duties of loyalty on fiduciaries, requiring them to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of . . . [1] providing benefits as to participants and their beneficiaries; and [2] defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1).

In addition to imposing general duties, ERISA prohibits fiduciaries from engaging in certain specific transactions. First, it restricts transactions between plans and fiduciaries. Under § 406(b)(1), a fiduciary may not "deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1). Second, ERISA restricts transactions between fiduciaries and non-fiduciary third parties, referred to as

---

[4] Courts occasionally also use the term "plan fiduciaries" to distinguish plan-affiliated fiduciaries (typically named fiduciaries) from fiduciaries that are third parties. *See, e.g.*, *Hecker v. Deere & Co.*, 556 F.3d 575, 586 ("We see nothing in the statute that requires plan fiduciaries to include any particular mix of investment vehicles in their plan."); *Zang and Others Similarly Situated v. Paychex, Inc.*, 728 F. Supp. 2d 261, 271 (W.D.N.Y. 2010) (explaining that a service provider is not a functional fiduciary if "the appropriate plan fiduciary in fact makes the decision to accept or reject the change" (quoting Dept. of Labor Advisory Op. 97-16A, 1997 WL 277979, at *5 (May 22, 1997))). The term "plan fiduciary," however, can be somewhat misleading. Third parties, such as service providers, that qualify as functional fiduciaries are also fiduciaries *of a plan*, and the relevant ERISA provisions use "fiduciary" as a catch-all term that does not distinguish between named fiduciaries and functional fiduciaries. *See, e.g.*, ERISA § 404(a), 29 U.S.C. § 1104(a).

"parties in interest."  The latter can include service providers.  *See* ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).  Under § 406(a), a fiduciary may not allow a plan to engage in a transaction the fiduciary knows or should know is (1) a "sale or exchange, or leasing, of any property between the plan and a party in interest"; (2) "lending of money or other extension of credit between the plan and a party in interest"; (3) "furnishing of goods, services, or facilities between the plan and a party in interest"; (4) "transfer to, use by or for the benefit of, a party in interest, of any assets of the plan"; or (5) "acquisition, on behalf of the plan, of any employer security or employer real property in violation of [§] 1107(a)."  29 U.S.C. § 1106(a)(1)(A)-(E).

If a fiduciary engages in one of these prohibited transactions under § 406, ERISA's civil enforcement provision, § 502, allows plan participants to sue the fiduciary "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan" or "to obtain other appropriate equitable relief."  ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).  Fiduciaries can avoid liability for a prohibited transaction if they qualify for certain exemptions under § 408 of ERISA.

3. **ERISA Non-Fiduciary Parties in Interest and Prohibited Transactions**

Although parties in interest have no fiduciary obligations to a plan or its participants, the Supreme Court has read § 502(a)(3) to allow a suit against a party in interest for its participation in a prohibited transaction.  *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241 (2000) ("*Salomon*") ("[Section] 502(a)(3) admits of no limit . . . on the universe of possible defendants.").  A party in interest is liable if it "had actual or constructive knowledge of the circumstances that rendered the

8

transaction unlawful"—that is, prohibited under § 406(a). *Id.* at 251. We discuss this standard in detail below.

B. *Factual Background*

1. **The Key Guaranteed Portfolio Fund**

a. *Overview*

Great-West offers an investment product called the Key Guaranteed Portfolio Fund ("KGPF"). The KGPF is a stable-value fund. It "guarantees capital preservation." Aplt. App., Vol. II at 150. This means KGPF participants will never lose the principal they invest or the interest they earn, which is credited daily to their accounts. *Id.* The KGPF was one of 29 investment options the Farmer's Rice Cooperative Plan's fiduciaries chose to offer participants like Mr. Teets.

b. *Great-West's management of the KGPF and the Credited Interest Rate*

Great-West deposits the money that participants have invested in the KGPF into its general account. That account, in turn, is invested in fixed-income instruments such as treasury bonds, corporate bonds, and mortgage-backed securities. Great-West employs a self-described "conservative investment strategy." *Id.* at 157, 173. Its investments earn lower interest rates than some higher-risk instruments or funds.

Money invested in the KGPF earns interest at the "Credited Interest Rate" (the "Credited Rate"). Under the contracts it executes with employer plans, Great-West sets the Credited Rate quarterly, announcing the new rate at least two business days before the start of each quarter. Its contract with Mr. Teets's Plan provides, "Interest earned on the Key Guaranteed Portfolio Fund value is compounded daily to the effective annual interest

9

rate. The interest rate to be credited to the Group Contractholder [the Plan] will be determined by [Great-West] prior to the last day of the previous calendar quarter." Aplt. App., Vol. I at 129. "The effective annual interest rate will never be less than 0%." *Id.*

Great-West retains as revenue the difference between the total yield on the KGPF's monetary instruments and the Credited Rate, also known as the "margin" or the "spread." Some portion of the margin goes toward Great-West's operating costs. Great-West publicly discloses an administrative fee of .89 percent, but claims that figure does not capture all the costs associated with maintaining the KGPF. Great-West retains as profit whatever portion of the margin exceeds its costs. The parties dispute the total KGPF-associated profit Great-West has earned, but all agree that as of 2016 it was greater than $120 million.

The Credited Rate dropped from 3.55 percent before the financial crisis in 2008 to 1.10 percent in 2016. During that time, the Credited Rate increased only once, in 2013. At the same time, Great-West's margin remained relatively constant, between approximately two and three percent.[5]

c. *Exiting the KGPF*

Plans may terminate their relationship with Great-West based on changes to the Credited Rate. If they do, Great-West "reserves the right to defer payment" of participants' KGPF money back to the plan—presumably to reinvest with another

---

[5] This figure is drawn from a report Mr. Teets's expert prepared at the summary judgment stage. Great-West does not disclose its margins as a matter of course.

provider—"not longer than 12 months."[6]  *Id*.  There is no evidence Great-West has ever

exercised the option to impose that waiting period.

Participants who have placed their money in the KGPF may withdraw their

principal and accrued interest at any time without paying a fee.  Great-West does,

however, prohibit plans offering the KGPF from also offering any other stable value

funds, money market funds, or certain bond funds—in other words, products with

comparable risk profiles.[7]

## C.  *Procedural Background*

Mr. Teets sued Great-West in the United States District Court for the District of

Colorado on behalf of all employee benefit plan participants who had invested in the

KGPF since 2008, as well as those participants' beneficiaries.  The district court certified

the class under Federal Rule of Civil Procedure 23(b)(3).  *See Teets v. Great-West Life &*

*Annuity Ins. Co.*, 315 F.R.D. 362, 374 (D. Colo. 2016).  At certification, the class

included approximately 270,000 KGPF participants spread across more than 13,000

---

[6] The KGPF is offered to participants in defined contribution retirement plans.  In such plans, either the employee participant or the employer (or both) contribute funds to a participant's retirement account.  *See* Edward A. Zelinsky, *The Defined Contribution Paradigm*, 114 Yale L.J. 451, 456 (2004).  In a 401(k) plan, one type of defined contribution plan, participants typically allocate the funds in their own accounts.  *Id.* at 484.  It is thus not clear that the Plan in this case invested any of its own funds into the KGPF.  But according to the Plan contract, if the Plan terminates its relationship with Great-West and stops offering the KGPF, the Plan can opt to have the total of the participants' accounts paid to it, presumably for reinvestment in another fund.

[7] Our review of the record supports this statement, and counsel for Great-West admitted as much at oral argument.  Oral Arg. at 28:30-28:55.

11

plans.[8] *Id.* at 369. None of the plans' named fiduciaries is a named plaintiff or a member of the class.

### 1. **Mr. Teets's ERISA Claims**

Mr. Teets alleged three ERISA violations. His first two claims alleged Great-West had violated ERISA's fiduciary duty provisions. First, Mr. Teets claimed that Great-West had breached its general duty of loyalty under § 404 by (1) setting the Credited Rate for its own benefit rather than for the plans' and participants' benefit, (2) setting the Credited Rate artificially low and retaining the difference as profit, and (3) charging excessive fees. Second, he claimed that Great-West, again acting in its fiduciary capacity, had engaged in a prohibited transaction under § 406(b) by "deal[ing] with the assets of the plan in [its] own interest or for [its] own account." 29 U.S.C. § 1106(b).

As a prerequisite to bring both of these claims, Mr. Teets alleged that Great-West is an ERISA fiduciary because it exercises authority or control over the quarterly Credited Rate and, by extension, controls its compensation. The district court limited its review of these two fiduciary duty claims by addressing only this prerequisite—that is, whether Mr. Teets had sufficiently established Great-West's fiduciary status. Because the court found that Great-West was not a fiduciary, it did not address whether Great-West had breached any fiduciary obligations. Great-West's fiduciary status is thus the focus of our review of Mr. Teets's fiduciary duty claims.

---

[8] The class period runs "until the time of trial." *Teets*, 315 F.R.D. at 374.

Mr. Teets's third claim, raised in the alternative, was based on Great-West's having non-fiduciary status. He alleged that Great-West was a non-fiduciary party in interest to a non-exempt prohibited transaction under § 406(a) insofar as it had used plan assets for its own benefit.

On all three claims, Mr. Teets sought declaratory and injunctive relief and "other appropriate equitable relief," including restitution and an accounting for profits. Aplt. App., Vol. I at 37.

2. **Summary Judgment Ruling**

After discovery, the parties filed cross-motions for summary judgment. The district court denied Mr. Teets's motion and granted summary judgment for Great-West. It disposed of Mr. Teets's first two claims at the same time, concluding that Great-West was not acting as a fiduciary of the Plan or its participants. It held that Great-West's contractual power to choose the Credited Rate did not render it a fiduciary under ERISA because participants could "veto" the chosen rate by withdrawing their money from the KGPF. *Id.* at 99. As to Great-West's ability to set its own compensation, the court held that Great-West did not have control over its compensation and thus was not a fiduciary because the ultimate amount it earned depended on participants' electing to keep their money in the KGPF each quarter.[9]

---

[9] Having concluded Great-West was not an ERISA fiduciary, the district court did not address whether, if it were a fiduciary, its conduct would amount to a breach of its duties.

13

The district court also granted summary judgment on Mr. Teets's third claim, concluding that Great-West was not liable as a non-fiduciary party in interest because Mr. Teets had failed to establish a genuine dispute as to whether Great-West had "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Id.* at 105 (quoting *Salomon*, 530 U.S. at 251). Mr. Teets timely appealed.

Our review thus focuses on (1) whether Great-West is a functional fiduciary because it "exercises . . . authority or control" over Plan assets, ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), when its sets the Credited Rate or its compensation; and (2) whether, if Great-West is not a fiduciary, it is liable as a non-fiduciary party in interest for its participation in a transaction prohibited under ERISA.

We will add further factual and procedural background as it becomes relevant.

D. ***Summary Judgment Background***

"We review a grant of summary judgment de novo, applying the same legal standard as the district court." *Coldesina*, 407 F.3d at 1131. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). We view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005).

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing

14

*Celotex*, 477 U.S. at 323). A movant that does not bear the burden of persuasion at trial may satisfy this burden "by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim." *Id.* (citing *Celotex*, 477 U.S. at 325).

"If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." *Id.* (quotations omitted). To satisfy this burden, the nonmovant must identify facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* (citation omitted). These facts "must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001).

"Where, as here, we are presented with cross-motions for summary judgment, we must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Ct. of N.M.*, 839 F.3d 888, 906-07 (10th Cir. 2016) (quotations omitted).

## II. **DISCUSSION**

Mr. Teets argues that (A) Great-West is a fiduciary because it has the authority to set the Credited Rate each quarter and, by extension, to determine its own compensation; and (B) even if Great-West is not a fiduciary, it is nonetheless liable as a party in interest because it benefitted from a transaction prohibited under ERISA.

### A. *Fiduciary Duty Claims—Great-West's Fiduciary Status*

The threshold question for the two fiduciary duty claims is whether Great-West is a functional fiduciary under ERISA. Mr. Teets argues it is because Great-West exercises

"authority or control" over the Plan or its assets by changing the Credited Rate without plan or participant approval. Aplt. Br. at 17-19, 25-26. He also contends Great-West has sufficient control over its own compensation to render it an ERISA fiduciary. We conclude that Mr. Teets did not make an adequate showing in response to Great-West's summary judgment motion to support these points.

The following discussion describes the pertinent legal background, summarizes the district court's ruling, and analyzes the evidence of Great-West's authority in relation to plans and participants.

## 1. **Legal Background**

As noted above, a service provider can be a functional fiduciary under § 3(21)(A) of ERISA when it exercises authority or control over plan management or plan assets. *See* 29 U.S.C. § 1002(21)(A). Courts consider an employee benefit plan contract—like the one between Mr. Teets's Plan and Great-West—to be an asset of the plan, such that a service provider's authority or control over the plan contract can give rise to fiduciary status. *See Chicago Bd. Options Exch., Inc. v. Conn. Gen. Life Ins. Co.*, 713 F.2d 254, 260 (7th Cir. 1983) ("*CBOE*") ("[T]he policy itself is a plan asset."); *accord* ERISA § 401(b)(2), 29 U.S.C. § 1101(b)(2) (providing that a contract for a guaranteed-benefit policy is an asset of the plan to which it is issued).

The case law points to a two-step analysis to determine whether a service provider is a functional fiduciary when a plaintiff alleges it has acted to violate a fiduciary duty.[10]

---

[10] This court has not decided any cases to determine whether a service provider exercised discretionary authority or control beyond the terms of a negotiated contract.

First, courts decide whether the service provider's alleged action conformed to a specific term of its contract with the employer plan. By following the terms of an arm's-length negotiation, the service provider does not act as a fiduciary. *See, e.g.*, *Schulist v. Blue Cross of Iowa*, 717 F.2d 1127, 1132 (7th Cir. 1983) (holding service provider was not fiduciary where its compensation was established through successive negotiations). Second, if the service provider took unilateral action beyond the specific terms of the contract respecting the management of a plan or its assets,[11] the service provider is a fiduciary unless the plan or perhaps the participants in the plan (see below) have the unimpeded ability to reject the service provider's action or terminate the relationship with the service provider. *See, e.g.*, *Midwest Cmty. Health Serv., Inc. v. Am. United Life Ins. Co.*, 255 F.3d 374, 377-78 (7th Cir. 2001) (holding service provider was fiduciary when it could make changes to plan contract without plan approval and would assess a fee for plans withdrawing funds).

Thus, to establish a service provider's fiduciary status, an ERISA plaintiff must show the service provider (1) did not merely follow a specific contractual term set in an

---

Accordingly, we must look outside the Tenth Circuit for guidance. Although our review includes cases dealing with pension and insurance plans in addition to 401(k) plans like Mr. Teets's, the lessons we draw from these cases about functional fiduciary status apply to the various types of benefit plans subject to ERISA regulation.

[11] Ministerial tasks alone do not qualify a service provider for fiduciary status. *See Olson v. E.F. Hutton & Co.*, 957 F.2d 622, 625 n.3 (8th Cir. 1992) ("It is well established that one who performs only ministerial tasks is not cloaked with fiduciary status."); *see also* 29 C.F.R. § 2509.75-8 (2018) (listing examples of ministerial actions that do not qualify as "discretionary authority or discretionary control respecting management of [a] plan").

arm's-length negotiation; and (2) took a unilateral action respecting plan management or assets without the plan or its participants having an opportunity to reject its decision.

   a.  *Arm's-length negotiation of contract terms*

When a service provider adheres to a specific contract term that is the product of arm's-length negotiation, courts have held that the service provider is not a fiduciary. *Schulist* provides a useful example.  717 F.2d at 1132.  In *Schulist*, a service provider won a contract to administer an employer's health care plan by submitting the winning bid—the lowest premium price—in a competitive bidding process.  *Id.* at 1129.  During the first year of operating under the contract, premium payments resulted in a large surplus.  *Id.*  The parties agreed to a lower premium for the second year, but the surplus returned.  In the third year, the parties negotiated a new contract whereby any surplus would be returned to the plan.  *Id.*  The employer's trustees sued the service provider for breach of contract and breach of fiduciary duty.  *Id.* at 1130.  The Seventh Circuit concluded that the service provider was not a fiduciary because, during the initial auction and at every subsequent renewal, "[the insurer] entered into an arm's length bargain presumably governed by competition in the marketplace."  *Id.* at 1132.

A service provider similarly does not owe a fiduciary duty regarding its compensation when compensation is fixed during an arm's-length negotiation.  In *Transamerica Life Insurance*, for example, the Ninth Circuit held that the manager of an employee retirement plan was not an ERISA fiduciary as to its compensation because the plan contract set the manager's compensation at a fixed percentage of the plan's assets, and it also provided a specific schedule for fees the manager could collect.  883 F.3d at

18

836; *see also F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1254-55, 1259 (2d Cir. 1987) (holding service provider was not a fiduciary when the contract that defined the amount of its compensation was the product of an arm's-length negotiation).

b. *Unilateral decisions regarding plan or asset management*

When a service provider acts with authority or control beyond the contract's specific terms, the service provider may be a fiduciary. And when the plan or the plan participants cannot reject the service provider's action or terminate the contract without interference or penalty, the service provider is a functional fiduciary. *See, e.g.*, *Charters v. John Hancock Life Ins. Co.*, 583 F. Supp. 2d 189, 199 (D. Mass. 2008) (holding service provider was fiduciary where plan attempting to terminate contract faced "built-in" monetary penalties). Fiduciary status turns on whether the service provider can force plans or participants to accept its choices about plan management or assets. *See, e.g.*, *CBOE*, 713 F.2d at 260 (finding fiduciary status where service provider "determined what type of investment the Plan must make"). The cases discussed in this section address whether plans faced impediments to rejecting service providers' actions.

In some cases, the service provider's unilateral decision changes a term of the plan contract. For example, in *CBOE*, a service provider provided investment services for an employee retirement benefit plan. *Id.* at 255-56. Under the contract, contributions made on behalf of each plan participant were deposited into an individual account. *Id.* at 256. The service provider announced that it was going to restructure the investment options it provided to the plan by creating a new account for each participant and annually transferring 10 percent of the balance from the participant's original account to the new

19

one, which was supposed to yield a higher rate of return. *Id.* This "unilateral" restructuring effectively amended the original terms of the contract. *Id.* If the plan disagreed with this approach and sought to terminate the contract and withdraw its participants' funds to reinvest them elsewhere, the service provider could limit the plan's withdrawal of funds to 10 percent of the total balance per year, effectively requiring 10 years to withdraw all of the funds. *Id.* The Seventh Circuit held that this restriction "lock[ed] [the plan] in" and made the service provider a functional fiduciary. *Id.* at 260.

In other cases, the contract may "grant[] [a service provider] discretionary authority" over an aspect of plan or asset management. *Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.2d 732, 737 (7th Cir. 1986). In those cases, too, the service provider's discretionary decision making—though authorized by contract—is "cabined by ERISA's fiduciary duties" unless plans or participants can freely reject the service provider's choices or terminate the contract. *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 422 (3d Cir. 2013). For example, in *Ed Miniat*, the service provider contracted with an employer to provide investment services for an employee insurance plan. Under the plan contract, the employer paid premiums to make life insurance available to employees upon their retirement. *See* 805 F.2d at 733-34. The service provider had the "apparent unilateral right to reduce the rate of return" it paid on the employer's contributions. *Id.* at 734. Before it issued any insurance under the plan, the service provider reduced the rate of return from 10 percent to 4 percent (the lowest value allowed by the contract) and increased premiums. *Id.* When the employer sought to terminate the contract, the service provider refused to reimburse half of the premiums the employer had paid. The Seventh

20

Circuit held the service provider was a fiduciary, reasoning that it had the power to unilaterally amend the contract. *Id.* at 738.[12]

In contrast to the foregoing cases holding a service provider to be a fiduciary, when plans and participants have a "meaningful opportunity" to reject a service provider's unilateral decision, courts have held the service provider is not a fiduciary. *Charters*, 583 F. Supp. 2d at 199. For example, in *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009), the Seventh Circuit declined to impose fiduciary duties on a fund manager that was retained to advise a plan on which investment options to include in the plan. *Id.* at 578, 584. It reasoned that the plan contract gave the plan, not the fund manager, "final say on which investment options [would] be included." *Id.* at 583; *see Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co.*, 768 F.3d 284, 295 (3d Cir. 2014) ("*John Hancock*") (holding no fiduciary relationship arose from service provider providing suggested list of funds where "trustees still exercised final authority over what funds would be included").

In *Zang and Others Similarly Situated v. Paychex, Inc.*, the employee benefit plan selected mutual funds to offer its participants from a list composed by a service provider.

_____

[12] *See also Midwest Cmty. Health Serv., Inc.*, 255 F.3d at 377 (holding that service provider was a fiduciary when it reserved the right to change terms without plan or participant approval and would assess a fee upon withdrawal of funds); *Charters*, 583 F. Supp. 2d at 198-99 (recognizing fiduciary duty where employee benefit plan sponsor faced "built-in penalties" for transferring assets to a different account or cancelling its contract if it was dissatisfied with how service provider exercised its contractual right to substitute investment options); *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 718 F. App'x 3, 5 (2d Cir. 2017) ("[F]iduciary status attaches to the party empowered to make unilateral changes to the investment menu by its contractual arrangement with the plan.").

21

728 F. Supp. 2d 261, 263 (W.D.N.Y. 2010). The service provider "reserve[d] the right to modify" the list of mutual funds the plan selected. *Id.* The contract required at least 60 days' notice of a proposed modification and an opportunity for the plan to reject the change or terminate the contract. *Id.* at 263-64. The court held that the service provider's ability to amend the list of available mutual funds did not give rise to fiduciary status because the contract gave the plan the ultimate say over whether the change would take effect. *Id.* at 271 n.6 ("Paychex could not force the employer to accept any particular deletion or substitution.").

The foregoing analysis applies to determining whether a service provider's control over its own compensation may make it a fiduciary. A contract might give a service provider "control over factors that determine the actual amount of its compensation." *Krear*, 810 F.2d at 1259. If the service provider exercises unilateral control over those factors, it can be a fiduciary. In *Pipefitters Local 636 Insurance Fund v. Blue Cross and Blue Shield of Michigan*, the Sixth Circuit held an insurer was a fiduciary as to its compensation. 722 F.3d 861 (6th Cir. 2013). State law required the service provider to pay one percent of its total income to the state, and its contract with the plan entitled it to pass along that cost to the plan. *Id.* at 864 (detailing provision allowing "any cost transfer subsidies or surcharges ordered by the State Insurance Commissioner . . . [to] be reflected in the . . . Amounts Billed"). But "the state did not fix the rate that Defendant charged *each customer*, and crucially, neither did the [contract] between Plaintiff and Defendant." *Id.* at 867 (emphasis added). Because the contract "in no way cabin[ed] [the provider's]

22

discretion" to decide how much of the fee to collect from each plan, the court held the service provider was an ERISA fiduciary. *Id.*[13]

2. **District Court Ruling**

The district court evaluated whether Great-West is a fiduciary based upon its changes to the Credited Rate and control over its compensation.

a. *Change to the Credited Rate*

The district court held that Great-West is not a fiduciary when it sets the Credited Rate. It acknowledged that "in some sense," Great-West "undoubtedly" exercises some control when it sets the Credited Rate. Aplt. App., Vol. I at 92. But the court recognized "a number of cases favoring the theory that a pre-announced rate of return prevents fiduciary status from attaching to the decision regarding the what [sic] rate to set, at least when the plan and/or its participants can 'vote with their feet' if they dislike the new rate." *Id.* "Thus," the court stated, "if the all the [sic] circumstances of the alleged ERISA-triggering decision show that the defendant does not have power to force its decision upon an unwilling objector, the defendant is not acting as an ERISA fiduciary

---

[13] *See also Abraha v. Colonial Parking, Inc.*, 243 F. Supp. 3d 179, 186 (D.D.C. 2017) (exercise of contractual authority to change from a flat per-participant fee to a percentage-of-contributions fee was an exercise of discretion over service provider's own compensation and therefore subject to ERISA fiduciary obligations); *Golden Star, Inc. v. Mass Mut. Life Ins. Co.*, 22 F. Supp. 3d 72, 80-82 (D. Mass. 2014) (insurer had discretion to set a "management fee" anywhere between zero and one percent and therefore was a fiduciary); *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co.*, 931 F. Supp. 2d 296, 304 (D. Mass. 2013) (bank had discretionary authority to set a "lending fee" anywhere from zero to 50 percent and was therefore a fiduciary).

with respect to that decision." *Id.* at 98. The court discussed this issue separately as it concerned plans and participants.

First, as to Great-West's ability to bind plans to its Credited Rate decisions, the district court rejected Mr. Teets's argument that plans cannot readily withdraw from the KGPF because Great-West has a right to impose a waiting period of up to one year. The court stated, "This is not an argument that the Court can consider in the present posture. . . . [W]hether [the waiting period] would actually be imposed . . . is speculative." *Id.* at 99.

Second, as to individual participants' ability to reject the Credited Rate, the district court concluded that participants do have a "real ability" to reject Great-West's choice of the Credited Rate by withdrawing their funds from the KGPF without fee or penalty. *Id.* Although it had "given serious thought to" the argument that participants cannot easily withdraw from the KGPF because Great-West prohibits plans from offering other comparable investment products, the court concluded that imposing a fiduciary duty on that basis would "introduce[] a host of other considerations individual to each participant." *Id.* As a result, it would be "too attenuated" to say that a given participant could not reject the Credited Rate each quarter. *Id.*

b. *Control over compensation*

The district court also concluded Great-West is not a fiduciary as to setting its compensation. Although it acknowledged that a service provider's control over compensation factors can give rise to fiduciary obligations, the court said this principle "has only been applied in cases where the alleged fiduciary has some form of direct

24

contractual authority to establish its fees and other administrative charges, or has authority to approve or disapprove the transactions from which it collects a fee." *Id.* at 100.

The court also reasoned that Great-West does not have control over its compensation because, even though it could use the Credited Rate to "influence its possible margins," the ultimate amount it earns depends on whether participants elect to keep their money in the KGPF each quarter. *Id.* at 101.

3. **Analysis**

Mr. Teets argues that Great-West's ability to set the Credited Rate renders it an ERISA fiduciary because neither the Plan nor its participants can reject changes to the Credited Rate.[14] He focuses on Great-West's (1) contractual right to impose a 12-month waiting period on withdrawing plans and (2) prohibition on plans' offering comparable investment options to participants. We conclude that Mr. Teets has not adduced sufficient evidence to create an issue of material fact as to whether either of the foregoing has prevented plans or participants from rejecting a change in the Credited Rate.

---

[14] The parties do not dispute that changing the Credited Rate is the kind of decision that might qualify Great-West for fiduciary status. Changing the rate of return on participants' investments cannot fairly be considered "ministerial" in the same way that calculating benefits or maintaining records can. *See In re Luna*, 406 F.3d at 1205 (holding that an employer's duty to make plan contributions pursuant to collective bargaining agreement was ministerial); 29 C.F.R. § 2509.75-8 (listing examples of ministerial functions). On the contrary, it is exactly the kind of action that would "affect the amount of benefits retirement plan participants will receive." *Harris Tr.*, 510 U.S. at 96.

Mr. Teets separately argues that Great-West's control over the Credited Rate gives it control over its compensation and thereby renders it an ERISA fiduciary. We conclude that because Great-West does not have unilateral authority or control over the Credited Rate, it also lacks such control over its compensation. We therefore affirm the district court's summary judgment ruling that Great-West is not a functional fiduciary.

a. *Change to the Credited Rate*

The contract between the Plan and Great-West does not set a Credited Rate or prescribe a Credited Rate formula. Instead, it authorizes Great-West to set the Credited Rate on a quarterly basis without input from the Plan or its participants. Accordingly, the Credited Rate is not the product of an arm's-length negotiation, and Great-West's fiduciary status therefore depends on whether the Plan or its participants can reject a change in the Credited Rate. To make that determination, we address Great-West's (1) right to impose a 12-month waiting period on departing plans and (2) prohibition on plans offering comparable investment options to their participants.

i. Potential 12-month waiting period for withdrawing plans

As discussed above, a service provider's unilateral decision regarding management of a plan or its assets can give rise to functional fiduciary status if the service provider can prevent or penalize plans for withdrawing funds from the service provider or terminating the contract. *See, e.g.*, *CBOE*, 713 F.2d at 260; *Charters*, 583 F. Supp. 2d at 199. When Great-West changes the Credited Rate, its contractual option to delay a plan's ability to receive funds from the KGPF upon termination of the contract may make it a fiduciary.

26

Mr. Teets contends that Great-West, like service providers held to be fiduciaries in *CBOE*, *Ed Miniat*, and *Midwest Community Health*, has "unhampered discretion" under ERISA because it has "the ability"—even if never used—"to force plans to accept the Credited Rate for up to a year." Aplt. Reply Br. at 7 (quotations omitted); *see* Aplt. Br. at 21-23.

Great-West argues that its contractual option to delay the return of a departing plan's funds does not establish fiduciary status because it has never exercised this right. Aplee. Br. at 29. It relies on ERISA's text, which confers fiduciary status on a service provider only to the extent it "exercises any discretionary authority or discretionary control" over a plan or its assets. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A); *see also Leimkuehler*, 713 F.3d at 911 (declining to recognize fiduciary status where service provider "reserve[d] the right to make substitutions to the funds" but "ha[d] never exercised this contractual right in a way that could give rise to a claim").

We agree with Great-West that its contractual option to impose a 12-month waiting period on plan withdrawal is different from the penalties and fees that gave rise to fiduciary status in the cases cited by Mr. Teets. In those cases, the penalties either had been or were certain to be enforced on the plans. *See, e.g.*, *Ed Miniat*, 805 F.2d at 734 (service provider actually "deducted 'front end load' charges" upon contract cancellation); *Midwest Cmty. Health Serv., Inc.*, 255 F.3d at 375 (service provider "would assess a withdrawal or 'surrender charge' and make an 'investment liquidation adjustment'" upon withdrawal); *Charters*, 583 F. Supp. 2d at 191 (plan was "subject to administrative charges" and "termination fees" upon cancellation or transfer of funds). In

27

other words, the service providers' rights to impose penalties in those cases had been or were certain to be "exercised." *See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). But in this case, a plan's attempt to terminate its KGPF contract in response to a change in the Credited Rate does not trigger the waiting period. Great-West must exercise its option to impose it, and Great-West never has.

We are not aware of any case finding fiduciary status under § 3(21)(A) of ERISA based on a service provider's unexercised contractual option to restrict or penalize withdrawal. But even if a potential restriction or penalty could make Great-West a fiduciary, it cannot do so in this case. This is so because Mr. Teets not only has provided no evidence that Great-West has ever imposed the waiting period on a plan's withdrawal, he has provided no evidence that even the potential of Great-West's imposing a waiting period has affected any plan's choice to continue with or withdraw from the KGPF contract. More than 3,000 plans have terminated the KGPF as a plan offering during the class period. Mr. Teets has not provided a single example showing the potential waiting period has deterred any of the 13,000 plans represented by participants in the class from withdrawing from the KGPF. Unlike in *CBOE*, there is no evidence a plan has actually been or is likely to be locked in to a Credited Rate for up to 12 months. *See* 713 F.2d at 260. Without any evidence that Great-West has exercised its right or that the right has deterred any plan from exiting the KGPF, summary judgment in favor of Great-West on this issue was appropriate.[15]

---

[15] In his opposition to Great-West's motion for summary judgment, Mr. Teets raised other penalties Great-West imposes on a departing plan. For example, he stated:

28

## ii.  Prohibition on comparable investment options for participants

We next turn to whether plan participants—the class members in this case—can reject the quarterly Credited Rate by withdrawing from the KGPF.  When Great-West moved for summary judgment contesting fiduciary status, it argued that "[t]he evidence shows that" when it changes the Credited Rate, "participants, not Great-West, have the 'final say' on whether any Credited Interest Rate will apply to their investments in the [KGPF]."  Aplt. App., Vol. II at 176.  Great-West contended that this was so because participants who have invested in the KGPF "can reject any new Credited Interest Rate by transferring their accounts out of the [KGPF] at any point, without penalty." *Id.*; *see also id.* at 151, 282-83.[16]  In response, Mr. Teets made two arguments, both unavailing.

> The default "cessation option" under [Great-West's contract with the Plan] is the "participant maintenance option," in which Great-West continues to hold participants' money in the KGPF until it is all transferred or distributed by the participants. . . . Further, the Contract provides for a "Contract Termination Charge" if the Contract is terminated before Great-West's recovery of all Start-Up Costs.

Aplt. App., Vol. II at 283.  But Mr. Teets did not raise this argument on appeal until his rebuttal at oral argument.  Oral Arg. at 38:20-39:27.  It is therefore waived. *See United States v. Dahda*, 852 F.3d 1282, 1292 n.7 (10th Cir. 2017) ("[I]ssues raised for the first time at oral argument are considered waived." (quotations omitted)), *aff'd*, 138 S. Ct. 1491 (2018).

[16] To support its argument, Great-West pointed to paragraph 15 of its statement of material facts, which asserted, in part, "Participants who allocate money to the [KGPF] can withdraw that money, both principal and any accrued earnings, at any time—even prior to the expiration of the 90-day guarantee period—without paying any fee or incurring any penalty."  Aplt. App., Vol. II at 151.  Paragraph 15, in turn, cited to the contract between the Plan and Great-West, which states that "[a]mounts may be transferred from the Participant's account balance in the Key Guaranteed Portfolio Fund

29

First, he disagreed that Great-West's fiduciary status may turn on whether participants can freely withdraw from the KGPF.[17]  He repeats this contention on appeal: "participants' ability to 'accept' or 'reject' Great-West's Credited Rate decision is legally irrelevant."  Aplt. Reply Br. at 9.  It is not clear to us why Mr. Teets would take this position, but if this were his only argument and we have understood it properly, he would have effectively conceded that participants' ability to leave the KGPF, impeded or unimpeded, has no effect on whether Great-West is a fiduciary.

Second, Mr. Teets argued, alternatively, in his opposition to summary judgment, that Great-West is a fiduciary because "Great-West precludes plans from offering alternative low-risk investments alongside the KGPF" and therefore participants are not free to leave.  Aplt. App., Vol. II at 301.  He noted that when his Plan contracted with Great-West, it agreed that no stable value fund—effectively, no fund with a similar risk

---

at any time," Aplt. App., Vol. I at 129, and to other evidence allegedly establishing that participants' withdrawals from the KGPF were "unrestricted."  Aplt. App., Vol. II at 151.

Unlike the concurrence, we think this was enough for Great-West, the "party seeking summary judgment," to "inform[] the district court" of why "it believe[d]" there was an "absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  As described below, Mr. Teets, after being put on notice that he needed to "present evidence opposing the argument[]" that participants could freely leave the KGPF, *see Bonney v. Wilson*, 817 F.3d 703, 710 (10th Cir. 2016), responded only by pointing to Great-West's policy against competing funds without showing that it restricted withdrawal.

[17] Mr. Teets asserted, "Great-West does not cite a single case supporting its contention that a service provider to an individual account defined contribution plan can avoid fiduciary status merely because participants have the ability to invest in or divest from the product offered by the service provider, and Plaintiff is aware of no such case." Aplt. App., Vol. II at 299-300.

profile—would be offered that is comparable to the KGPF. *Id.* at 292-93, 301. As a result, "participants who divest from the KGPF in response to a change in Credited Rate are forced to alter the risk profile of their retirement accounts." *Id.* at 301. It follows, he asserted, that Great-West is a fiduciary as to setting the Credited Rate. *See id.*

Mr. Teets's opposition to summary judgment on this alternative ground lacked supporting law or facts. He has not cited, and we have not found, a case in which a court has deemed a service provider to be a fiduciary based on participants' lack of alternative investment options, or on anything other than imposing a penalty or fee for withdrawal. Moreover, Mr. Teets has not cited, and we have not found, a case finding fiduciary status based solely on restrictions on participants' ability to leave a fund.[18]

Even if the ability of participants to reject service provider actions is relevant to the fiduciary status, Mr. Teets failed to provide factual support to counter Great-West's assertion in district court that participants can freely transfer their money out of the KGPF. *See id*. at 176. He pointed only to Great-West's policy against competing funds.

---

[18] Although service providers in the life insurance context have been held to be ERISA fiduciaries in their dealings with beneficiaries—as opposed to plans—these cases do not help Mr. Teets. *Vander Luitgaren v. Sun Life Assurance Co. of Canada*, 966 F. Supp. 2d 59 (D. Mass 2012), provides a useful illustration. In that case, a service provider administering a life insurance policy was held to be an ERISA fiduciary when it paid benefits to a plaintiff beneficiary using a retained-asset account and had unilateral control over the rate of return on the account. *Id.* at 61-62, 70. But even if life insurance beneficiaries (who do not themselves pay for life insurance) were analogous to 401(k) plan participants (who invest their own money in various funds), the plaintiff in *Vander Luitgaren* could not have cancelled his relationship with the service provider without suffering a penalty—namely, losing the potential benefits under the life insurance policy.

He adduced no evidence that this policy forced participants to accept a Credited Rate or that they felt effectively locked in to the KGPF. *See CBOE*, 713 F.2d at 260.

Like the 12-month waiting period's potential effect on plans, the restriction on competing investment options may impede participants from exiting the KGPF. But as with the waiting period, Mr. Teets offered no evidence that the competing fund provision has affected any of the 270,000 participants' decisions to stay with or leave the KGPF. Mr. Teets has not even alleged that the competing fund provision has affected his own choice about participation in the KGPF.

In sum, in response to Great-West's contention that it should receive summary judgment because the plan participants are free to leave the KGPF after a change in the Credited Rate, Mr. Teets said (1) the participants' freedom to leave the KGPF is not relevant to fiduciary status and (2) if it were, Great-West is a fiduciary because the limit on competing funds restricted participants' ability to leave. The first point seems to concede the issue to Great-West. On the second, Mr. Teets failed to provide legal support or "'set forth specific facts' from which a rational trier of fact could find" in his favor. *Libertarian Party of N.M.*, 506 F.3d at 1309 (citing *Celotex*, 477 U.S. at 323).

\*    \*    \*    \*

 Summary judgment on the issue of Great-West's authority or control over the Credited Rate was proper.

32

b. *Control over compensation*

Mr. Teets's failure to show Great-West has authority or control over the Credited Rate means he cannot show Great-West has authority or control over its compensation.[19] Great-West argues, and Mr. Teets does not contest, that its compensation is a function not only of the Credited Rate, but also of "(1) the willingness of plans and participants to accept the Credited Interest Rates that Great-West offers; and (2) the performance of the volatile financial markets in which Great-West invests its general account." Aplee. Br. at 31. Of these variables, Mr. Teets contends Great-West has control over the Credited Rate. He acknowledges any control Great-West has over its compensation "will always be cabined by external realities and limitations like the market's actual performance. . . . And plans and participants entering and leaving the [KGPF] will have some impact on the total amount of Great-West's compensation." Aplt. Br. at 26 n.7. But, he argues, "when Great-West exercises its authority to set the Credited Rate, it also determines the amount of its own compensation." *Id.* at 26.

---

[19] A Department of Labor ("DOL") rule cited by Great-West appears to suggest that Great-West's margin may not be compensation at all: "For purposes of [the reasonable compensation] exemption, the 'spread' is not treated as compensation." Final Amendment to and Partial Revocation of Prohibited Transaction Exemption (PTE) 84-24, 81 Fed. Reg. 21147, 21167 & n.62 (Apr. 8, 2016). The rule is somewhat ambiguous, however. It also states that "compensation" under § 408(b)(2) includes "indirect compensation received from any source other than the plan or IRA in connection with the recommended transaction," *id.* at 21167, which could conceivably include the money Great-West earns on KGPF investments. We do not resolve this tension and instead conclude that even if Great-West's margin were compensation, Mr. Teets has not shown that Great-West has sufficient control over it to be a fiduciary.

Mr. Teets's argument that Great-West exercises authority or control over its compensation because it exercises authority or control over the Credited Rate is self-defeating. As we have already discussed, Mr. Teets has not shown that Great-West has discretion over the Credited Rate. It follows that Great-West similarly lacks discretion or control over its compensation. *Accord Insigna v. United of Omaha Life Ins. Co.*, No. 8:17CV179, 2017 WL 6884626, at *4 (D. Neb. Oct. 26, 2017) (finding a service provider did not exercise control over its compensation where its compensation was "too attenuated" from its choice of monthly interest rate). Accordingly, summary judgment was proper on Mr. Teets's claims of fiduciary liability.[20]

---

[20] Great-West also argued in the district court that it was not a fiduciary because ERISA's guaranteed-benefit policy ("GBP") exemption covers the KGPF. A GBP is "an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer." ERISA § 401(b)(2)(B), 29 U.S.C. § 1101(b)(2)(B). A key feature of GBPs is that they "allocate[] investment risk to the insurer." *Harris Tr.*, 510 U.S. at 106. For plans incorporating GBPs, ERISA provides that "the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer." § 1101(b)(2). A company that issues a GBP cannot become a functional fiduciary by exercising authority or control over plan funds because the funds are not plan assets under the statute.

The district court found the KGPF allocates risk to Great-West because it guarantees participants' principal and all earned interest and because Great-West fixes the rate of return in advance. Accordingly, it could not be a fiduciary in its administration of the assets participants allocated to the KGPF. The court concluded that the GBP exemption did not free Great-West of all fiduciary obligations because the "*contract* by which the insurer obtained [participants'] contributions remains a part of the plan," and Great West's management of the contract (as opposed to the money) could be subject to fiduciary duties. Aplt. App., Vol. I at 91-92 (emphasis added).

On appeal, Great-West does not contend the GBP exemption shields it from fiduciary status.

## B. *Non-Fiduciary Prohibited Transaction Claim*

Having affirmed summary judgment that Great-West is not a fiduciary, we turn to whether the district court properly granted summary judgment to Great-West on Mr. Teets's non-fiduciary party-in-interest claim. Because Mr. Teets failed to carry his burden to show that he qualified for "appropriate equitable relief" under ERISA § 502(a)(3), we affirm summary judgment for Great-West.[21]

### 1. **Legal Background—ERISA**

Section 406(a) of ERISA lists transactions that are prohibited between fiduciaries and non-fiduciary parties in interest. 29 U.S.C. § 1106(a). Section 408(b) recognizes exemptions to the prohibitions in § 406(a). 29 U.S.C. § 1108(b). Section 502(a)(3) authorizes participants to bring civil suits to obtain equitable relief for violations of ERISA. 29 U.S.C. § 1132(a)(3). We describe these provisions below and discuss how they apply to fiduciaries and to non-fiduciary parties in interest, such as Great-West.

### a. *Prohibited transactions under ERISA § 406(a)*

Section 406(a) of ERISA prohibits fiduciaries like the Farmer's Rice Cooperative from engaging in certain transactions with "part[ies] in interest," such as service

---

[21] The parties spent most of their summary judgment briefing in district court on the fiduciary duty claims and devoted limited attention to this claim. Great-West's motion, Mr. Teets's opposition, and Great-West's reply each addressed the non-fiduciary claim in less than three pages. Aplt. App., Vol. II at 181-83, 316-18, 366-68. As explained below, Mr. Teets's cursory treatment of this claim prevents him from overcoming summary judgment.

providers like Great-West. 29 U.S.C. §§ 1106(a), 1002(14)(B). The transactions listed in § 406(a) "create some bright-line rules, on which plaintiffs are entitled to rely." *Allen v. GreatBanc Trust Co.*, 835 F.3d 670, 676 (7th Cir. 2016). Congress enacted § 406(a)'s "per se violations," *Chao v. Hall Holding Co.*, 285 F.3d 415, 441 n.12 (6th Cir. 2002), to bar transactions "deemed likely to injure the . . . plan." *Salomon*, 530 U.S. at 242 (quotations omitted). Violation of § 406(a) can lead to liability for fiduciaries or non-fiduciary parties in interest. *See id.* at 241.

Under § 406(a), a fiduciary may not allow a plan to engage with a non-fiduciary party in interest in a transaction that the fiduciary knows or should know is (1) a "sale or exchange, or leasing, of any property between the plan and a party in interest"; (2) "lending of money or other extension of credit between the plan and a party in interest"; (3) "furnishing of goods, services, or facilities between the plan and a party in interest"; (4) "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan"; or (5) "acquisition, on behalf of the plan, of any employer security or employer real property in violation of [§] 1107(a)." 29 U.S.C. § 1106(a)(1)(A)-(E). On its face, § 406(a) covers wide swaths of plan activity. But as the following section explains, certain § 406(a) transactions are exempt from ERISA liability under § 408(b).

36

The § 406(a)[22] prohibition most relevant to this case is the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." *Id.* § 1106(a)(1)(D).[23]

b. *Exemptions under ERISA § 408(b)*

Although § 406(a) broadly delineates prohibited transactions, § 408(b) provides exemptions for parties engaged in those transactions. 29 U.S.C. § 1108(b). "ERISA plans engage in transactions nominally prohibited by § [406] all the time, while also taking steps to comply with ERISA by relying on one or more of the many exceptions under § [408]." *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 685-86 (7th Cir. 2014). These exemptions allow plans to do business with parties in interest if certain conditions are met. ERISA § 408(b), 29 U.S.C. § 1108(b).

---

[22] Although Mr. Teets's amended complaint alleged Great-West also violated § 406(b), that violation was premised on Great-West's acting as a fiduciary. Section 406(b) prohibits fiduciaries from benefitting from transactions with their plans, and § 406(b) claims can only be brought against fiduciaries. *See* 29 U.S.C. § 1106(b).

[23] Great-West contends Mr. Teets forfeited his argument that Great-West was a party to a prohibited transaction under § 406(a) because he relied upon different subsections of that statute to support his theory of liability in the district court. In the district court, Mr. Teets argued Great-West engaged in a prohibited transaction when it "use[d] . . . a plan asset . . . for [its] benefit," invoking § 406(a)(1)(D). Aplt. App., Vol. II at 217. He then stated in his opening brief that "Section [406](a) generally prohibits parties in interest from 'furnishing . . . services' to a plan," paraphrasing § 406(a)(1)(C). Aplt. Br. at 41. His reply brief explains that his opening brief "plainly refers to activity prohibited by Section [406](a)(1)(A) and (D)," and that he merely "quoted [§ 406(a)(1)C)] as an *example*." Aplt. Reply Br. at 19 (citations omitted). At oral argument, counsel for Mr. Teets stated the prohibited transaction at issue was Great-West's use of plan assets for its own benefit, as prohibited under § 406(a)(1)(D). Oral Arg. at 0:58-2:19. Mr. Teets thus has consistently contended that Great-West conducted a prohibited transaction under § 406(a)(1)(D) and has not forfeited that argument. We evaluate his non-fiduciary liability claim based on that provision.

37

The § 408(b) exemption pertinent to this case allows parties in interest to provide "services necessary for the establishment or operation of the plan"—otherwise prohibited under § 406(a)—so long as "no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2).[24]

c. *Non-fiduciary party-in-interest liability for prohibited transactions*

To be liable for a § 406(a) prohibited transaction, a non-fiduciary party in interest such as Great-West must have engaged in such a transaction and "have had actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Salomon*, 530 U.S. at 251. "Those circumstances, in turn, involve a showing that the *plan fiduciary*, with actual or constructive knowledge of the facts satisfying the elements of a § 406(a) transaction, caused the plan to engage in the transaction." *Id.* But as discussed above, even if the plaintiff can prove these § 406(a) elements, the party in interest may not be liable if it qualifies for a § 408(b) exemption.[25] *See* 29 U.S.C. § 1108(b)(2); *Salomon*, 530 U.S. at 251.

---

[24] As discussed in more detail in footnote 16 above, DOL rules suggest the compensation that Mr. Teets claims was unreasonable—the margin Great-West retained after paying participants according to the Credited Rate—is not "compensation" at all for purposes of § 408(b).

[25] The parties dispute whether the plaintiff or the non-fiduciary party in interest bears the burden of establishing the party in interest's eligibility for a § 408(b) exemption. We need not resolve this dispute because we affirm the district court's grant of summary judgment as to Mr. Teets's non-fiduciary claim on another ground.

d. *Appropriate equitable relief*

In addition to satisfying the requirements of *Salomon*, a plaintiff bringing suit against a non-fiduciary party in interest must show that equitable relief can be granted. ERISA's civil enforcement provision, § 502(a)(3), allows a "participant, beneficiary, or fiduciary" to bring a civil suit "to enjoin any act or practice" that violates ERISA or "to obtain other appropriate equitable relief . . . to redress such violations."  29 U.S.C. § 1132(a)(3).  Satisfying § 502(a)(3) functions as an element of the ERISA claim.  If a plaintiff cannot demonstrate that equitable relief is available, the suit cannot proceed.  For example, in *Central States, Southeast & Southwest Areas Health & Welfare Fund v. Gerber Life Insurance Co.*, 771 F.3d 150 (2d Cir. 2014), the Second Circuit affirmed dismissal of a plaintiff's complaint under Federal Rule of Civil Procedure 12(b)(6) because it failed to seek appropriate equitable relief.  *Id*. at 154-58; *see also Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 206 (2002) ("The question presented is whether § 502(a)(3) of [ERISA] authorizes this action by petitioners . . . ."); *accord Pender v. Bank of Am. Corp.*, 788 F.3d 354, 361-65 (4th Cir. 2015) (treating the § 502(a)(3) inquiry as a threshold requirement at summary judgment stage).

In the remainder of this section we explain (1) how the Supreme Court has interpreted the scope of § 502(a)(3), (2) the requirement that plaintiffs seeking equitable restitution under § 502(a)(3) identify a specific *res*[26] from which they seek to recover,

---

[26] The Latin term "*res*" generally refers to an "object, interest, or status, as opposed to a person."  *Res*, Black's Law Dictionary (10th ed. 2014).  In the trust context, it denotes the property that is the subject matter of a trust.  *See id.*; *Begier v. I.R.S.*, 496 U.S. 53, 70 (1990) ("[N]o trust exists until a res is identified." (Scalia, J., concurring)).

(3) the modification of that requirement for claims seeking the restitutionary remedies of accounting for profits and disgorgement of profits, and (4) the effect of a defendant's commingling assets with the plaintiff's property on the availability of equitable relief.

### i. Scope of equitable relief under § 502(a)(3)

The Supreme Court has interpreted "appropriate equitable relief" under § 502(a)(3) to include equitable remedies that only historical courts of equity were empowered to award. It has excluded remedies typically available in historical courts of law, such as compensatory damages.

In *Mertens*, the Supreme Court said that § 502(a)(3) of ERISA encompasses "those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." 508 U.S. at 256. "[A]t common law, the courts of equity had exclusive jurisdiction over virtually all actions by beneficiaries for breach of trust." *Id.* "[T]here were many situations . . . in which an equity court could 'establish purely legal rights and grant legal remedies which would otherwise be beyond the scope of its authority.'" *Id.* (quoting 1 Spencer W. Symons, *Pomeroy's Equity Jurisprudence* § 181 at 257 (5th ed. 1941)). But "appropriate equitable relief" does not encompass all forms of "relief a court of equity [would be] empowered to provide in the particular case at issue, including ancillary legal remedies." *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 660 (2016) (quotations omitted). Instead, it includes remedies that could be awarded only by equity courts. *See Mertens*, 508 U.S. at 258 ("Regarding 'equitable' relief in § 502(a)(3) to mean 'all relief available for breach of trust at common law' would . . . deprive of all

40

meaning the distinction Congress drew between . . . 'equitable' and 'legal' relief.").

Thus, "legal remedies—even legal remedies that a court of equity could sometimes award—are not 'equitable relief' under § 502(a)(3)." *Montanile*, 136 S. Ct. at 661.

Certain remedies can be equitable or legal, depending on the circumstances. "Equitable remedies 'are, as a general rule, directed against some specific thing; they give or enforce a right to or over some particular thing . . . rather than a right to recover a sum of money generally out of the defendant's assets.'" *Id.* at 658-59 (alteration in original) (quoting 4 Symons, § 1234 at 694). "[T]he fact that . . . relief takes the form of a money payment does not remove it from the category of traditionally equitable relief." *CIGNA Corp v. Amara*, 563 U.S. 421, 441 (2011).

### ii. Tracing requirement for equitable restitution

Payment of restitution, which Mr. Teets seeks, can be equitable or legal. *See Knudson*, 534 U.S. at 212. A plaintiff can recover equitable restitution, "ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession."[27] *Id.* at 213. In those circumstances, "[a] court

---

[27] The *Salomon* Court explained a constructive trust:
> Whenever the legal title to property is obtained through means or under circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same . . . .

530 U.S. at 250-51 (quoting *Moore v. Crawford*, 130 U.S. 122, 128 (1889)); *see also* 1 Dan B. Dobbs, *Dobbs Law of Remedies* § 4.3(1) at 587 (2d ed. 1993) ("In the

41

of equity could . . . order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner." *Id.* Accordingly, "[f]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214.

In contrast, when the plaintiff cannot "assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him," the plaintiff has a right to *legal* restitution. *Knudson*, 534 U.S. at 213 (quoting 1 Dan B. Dobbs, *Dobbs Law of Remedies* § 4.2(1) at 571 (2d ed. 1993)). Such claims are considered legal because the plaintiff is seeking "to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money." *Id.* (quoting Restatement (First) of Restitution § 160 cmt. a (Am. Law Inst. 1937)); *accord Montanile*, 136 S. Ct. at 659 (describing "a personal claim against the wrongdoer" as "a quintessential action at

---

constructive trust case the defendant has legal rights in something that in good conscience belongs to the plaintiff. The property is 'subject to a constructive trust.'").

An equitable lien "is simply a right of a special nature *over* the thing . . . so that the very thing itself may be proceeded against in an equitable action." *Montanile*, 136 S. Ct. at 659 (alteration in original) (quoting 4 Symons, § 1233 at 692). An equitable lien can arise out of a contract between the parties or can be "imposed, not as a matter of contract, but to prevent unjust enrichment." 1 Dobbs, § 4.3(3) at 601. In such a case, the equitable lien "is essentially a special, and limited, form of the constructive trust." *Id.*

42

law"). As we have explained, under § 502(a)(3), legal restitution is not available for ERISA claims.

### iii. Modified tracing requirement for accounting and disgorgement of profits

Accounting for profits (also referred to as an "accounting") and disgorgement of profits are forms of restitution. *See Knudson*, 534 U.S. at 214 n.2 ("[A]n accounting for profits [is] a form of equitable restitution."); *Tull v. United States,* 481 U.S. 412, 424 (1987) ("An action for disgorgement of improper profits . . . is a remedy only for restitution.").[28] "The ground of this liability is unjust enrichment." 1 Dobbs, § 4.3(5) at 611. A court order for an accounting or disgorgement of profits allows the plaintiff to "recover a judgment for the profits due from use of his property," *id.* at 608, and thus "holds the defendant liable for his profits, not for damages," *id.* at 611.

The tracing requirement described above for equitable restitution also applies to accounting and disgorgement of profits but may be modified in certain limited circumstances. *See Knudson*, 534 U.S. at 214 n.2. "If, for example, a plaintiff is entitled to a constructive trust on a particular property held by the defendant, he may also recover profits produced by the defendant's use of that property, even if he cannot identify a particular *res* containing the profits sought to be recovered." *Id.*; *Pender*, 788 F.3d at

---

[28] S*ee also Edmonson*, 725 F.3d at 419 ("[D]isgorgement and accounting for profits are essentially the same remedy." (citing Restatement (Third) of Restitution and Unjust Enrichment § 51(4) & cmt. a (Am. Law Inst. 2011))).

364[29]; 1 Dobbs, § 4.3(5) at 614 ("If the accounting seeks to recover a fund that has been traced, so that it is in effect a constructive trust on a fund of money, the case might be classed as an equitable suit.").

To qualify for this remedy in equity, the plaintiff still must show entitlement "to a constructive trust on particular property held by the defendant" that the defendant used to generate the profits. *Knudson*, 534 U.S. at 214 n.2; *see also In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220, 238 (3d Cir. 2009) ("[P]laintiffs cannot recover under [an accounting or a disgorgement of profits] theory without first identifying the profit generating property or money wrongly held by [the defendant]."); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. SACV 15-1614-JLS (JCGx), 2016 WL 4507117 (C.D. Cal. Aug. 5, 2016).[30] Accordingly, without a particular profit-

---

[29] In *Pender*, the Fourth Circuit held that retirement plan participants seeking disgorgement of profits satisfied § 502(a)(3)'s "appropriate equitable relief" requirement. 788 F.3d at 365. The participants invested in a retirement plan managed by their employer. The employer offered participants the option to transfer existing investments into a new account that, unlike the original account, guaranteed they would not lose their principal. *See id.* at 358. The new account appeared to allow participants to select from a list of investment options with declared rates of return, but in reality, the employer invested participants' money in higher-return instruments and pocketed any returns leftover after paying participants according to the declared rates. *Id.* at 358-59. The IRS declared the transfers unlawful and the participants sued under ERISA for disgorgement of the employer's profits. *Id.* at 358. The Fourth Circuit held the participants could bring their claims under § 502(a)(3) of ERISA because they were "seek[ing] profits generated using assets that belonged to them." *Id.* at 365.

[30] In *Urakhchin*, participants in a 401(k) retirement plan sought under § 502(a)(3) to recover profits from non-fiduciary defendants who allegedly "improperly receive[d] Plan assets as profits at the expense of the Plan and its beneficiaries." 2016 WL 4507117, at *2. The court dismissed the complaint, explaining that the complaint was missing an allegation that the plaintiffs would "be able to trace the exact transactions and

44

generating *res*, a claim for payment out of the defendant's general assets is a request for legal relief rather than for equitable accounting or disgorgement of profits and cannot be awarded under § 502(a)(3).

### iv. Commingled funds and traceability

If a defendant disposes of all of the particular property that allegedly should belong to the plaintiff under equitable principles, the plaintiff no longer has a specifically identifiable *res*. The Supreme Court said in *Montanile* that § 502(a)(3) does not authorize "a suit to attach the [defendant's] general assets" as a substitute for the previously identifiable property. 136 S. Ct. at 655; *see also Knudson*, 534 U.S. at 213-14. *Montanile* further recognized "that commingling a specifically identified fund—to which a lien attached—with a different fund of the defendant's did not destroy the lien. Instead, that commingling allowed the plaintiff to recover the amount of the lien from the entire pot of money." 136 S. Ct. at 661. In other words, "[t]he person whose money is wrongfully mingled with money of the wrongdoer does not thereby lose his interest in the money, . . . but he acquires an interest in the mingled fund." Restatement (First) of Restitution § 209 cmt. a (Am. Law Inst. 1937).

## 2. **Additional Procedural Background**

Because we review summary judgment based on the "materials adequately brought to the attention of the district court by the parties," *Adler v. Wal-Mart Stores,*

---

entities related to each fiduciary breach, and thus [that] the property is sufficiently traceable for purposes of an equitable restitution claim." *Id.* at *8.

*Inc.*, 144 F.3d 664, 671 (10th Cir.1998), we recount Mr. Teets's response to Great-West's summary judgment motion. We then summarize the district court's ruling.

a. *Great-West's motion for summary judgment on the non-fiduciary claim and Mr. Teets's response*

Great-West's sole argument for summary judgment on Mr. Teets's non-fiduciary claim was that he did not seek "appropriate equitable relief" available under ERISA. Great-West contended that Mr. Teets was seeking "as damages the margin on Great-West's general account assets" and claimed he "[could not] point to any evidence that Great-West's general account investment returns form a specifically-identifiable *res* that properly can be traced to any plan." Aplt. App., Vol. II at 182-83.

Mr. Teets did not attempt to rebut Great-West's argument by identifying the funds in Great-West's possession that generated the alleged profits he sought to recover. In his response, Mr. Teets stated that accounting and disgorgement of profits are recognized forms of equitable relief, *id.* at 317, and that "disgorgement of profits does not require the recovered funds to be traceable to a *res* or particular funds." *Id.* at 318.

b. *District court ruling*

The district court started with whether equitable relief was a possible remedy for Mr. Teets's claim and whether summary judgment could be granted because it was not. It recognized that "an order to pay money, even if functionally equivalent to a judgement awarding damages, qualifies as 'appropriate equitable relief' in some ERISA cases." Aplt. App., Vol. I at 102. Citing *Knudson*, 534 U.S. at 212-21, the court explained that an accounting for profits could be one such type of monetary equitable relief. But the

46

court ultimately declined to decide whether the relief Mr. Teets requested was equitable, pointing to the hazy "distinction between money-awarding remedies at law and money-awarding remedies in equity." *Id.* at 104.

Instead, the district court granted summary judgment for Great-West on a ground Great-West had not raised in its motion, concluding that Mr. Teets had not adduced sufficient evidence of Great-West's liability for its participation in a prohibited transaction. *Id.* at 106-08. The court rejected Mr. Teets's argument that *Salomon* required him to show only that Great-West as a party in interest had knowledge of "facts satisfying the elements" of ERISA § 406(a). *Id.* at 105-06. The court compared *Salomon*'s description of the knowledge that defendant *fiduciaries* must have to be liable—"facts satisfying the elements of a § 406(a) transaction," *Salomon*, 530 U.S. at 251—with *Salomon*'s requirement that defendant *non-fiduciary parties in interest* have knowledge of the "circumstances that render the transaction unlawful," observing that the latter "appears aimed at exploring not just knowledge of the underlying facts, but knowledge of their potential unlawfulness." Aplt. App., Vol. I at 106. Accordingly, the court concluded that Mr. Teets must prove that Great-West, as a non-fiduciary party in interest, "knew or should have known that the transaction violated ERISA." *Id.* at 107. Because Mr. Teets "ha[d] not attempted to make this showing," his claim could not survive summary judgment. *Id.*

3. **Analysis**

To prevail on his non-fiduciary claim, Mr. Teets must show, among other things, that he seeks equitable relief under § 502(a)(3) of ERISA. We conclude summary

47

judgment was properly granted because Mr. Teets failed to identify the particular property in Great-West's possession over which he can "assert title or right to possession." *Knudson*, 534 U.S. at 213. He therefore failed to meet his burden to demonstrate the relief he seeks is equitable under § 502(a)(3).

a. *Summary judgment standard—review of materials presented to district court*

When this court reviews a district court's grant of summary judgment, "we conduct that review from the perspective of the district court at the time it made its ruling, ordinarily limiting our review to the materials adequately brought to the attention of the district court by the parties." *Adler*, 144 F.3d at 671. The district court may "go beyond the referenced portions" of the plaintiffs' evidentiary materials, "but is not required to do so." *Id.* at 672.

This court also may "more broadly review the record on appeal," but we ordinarily do not do so because "we, like the district courts, have a limited and neutral role in the adversarial process, and are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it." *Id.*; *see SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1513 (10th Cir. 1990) (holding that the court of appeals "need not 'sift through' the record to find [the appellant's] evidence" in the absence of citations in the appellant's brief). "Thus, where the burden to present such specific facts by reference to exhibits and the existing record was not adequately met below, we will not reverse a district court for failing to uncover them itself." *Adler*, 144 F.3d at 672.

48

b. *Waiver of request for injunction*

Mr. Teets did not preserve an argument that his amended complaint's request for an injunction satisfies § 502(a)(3)'s allowance for suits seeking "to enjoin any act or practice" that violates ERISA. 29 U.S.C. § 1132(a)(3). His amended complaint asked the court to "[e]njoin Defendant from further prohibited transactions," Aplt. App., Vol. I at 38, which appears to satisfy § 502(a)(3). But Mr. Teets failed to rely on this remedy to overcome summary judgment.

Mr. Teets has not mentioned injunctive relief in any filing since the amended complaint. When prompted by Great-West's motion, he relied on other remedies—namely, accounting and disgorgement of profits. Great-West's motion stated not only that Mr. Teets could not satisfy the "appropriate equitable relief" standard, but also that "the relief Plaintiff seeks is not available under [§ 502(a)(3)]" at all. Aplt. App., Vol. II at 181. In response, Mr. Teets did not mention an injunction, instead asserting only that he sought "Appropriate Equitable Relief," and even quoting that distinct portion of the statute. *Id.* at 316-17.

Even if Mr. Teets had done enough in the district court to preserve his argument that his request for an injunction satisfied § 502(a)(3), he has abandoned any such argument on appeal. In this court, Mr. Teets argues that "ERISA provides [him] a remedy for Great-West's violation," but he never mentions the injunction. Aplt. Br.

49

at 50. He explains, "Restitution of property and disgorgement are the central remedies Mr. Teets seeks here." Aplt. Reply Br. at 26.[31]

Thus, although § 502(a)(3) authorizes injunctive relief, Mr. Teets did not rely on this form of relief to contest summary judgment, and he does not even do so on appeal. He has waived this basis to overcome summary judgment. *See Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1266 (10th Cir. 2004) ("Issues not raised in the opening brief are deemed abandoned or waived." (quotations omitted)); *see also Paycom Payroll, LLC v. Richison*, 758 F.3d 1198, 1203 (10th Cir. 2014) (holding appellant had waived challenge to one element of copyright infringement claim by urging district court to rule on a separate element).

c. *Failure to specify particular profit-generating property*

Mr. Teets's amended complaint requested monetary relief in the form of (1) disgorgement of the profits Great-West obtained through knowing participation in prohibited transactions; (2) imposition of a constructive trust or equitable lien on funds Great-West received through those transactions; and (3) "other appropriate equitable relief," including restitution and an accounting for profits. Aplt. App., Vol. I at 38.

As discussed above, to be eligible for "appropriate equitable relief" in the form of restitution, Mr. Teets must show that Great-West possesses particular property that

---

[31] The reply brief elaborates on the remedies Mr. Teets sought in the district court, but injunctive relief is conspicuously absent: "Great-West claims Mr. Teets sought only an accounting for profits below. This is incorrect: he also specifically requested 'disgorge[ment],' 'constructive trust,' 'equitable lien,' and 'restitution.'" Aplt. Reply Br. at 26 n.11 (alteration in original) (citation omitted) (quoting Aplt. App., Vol. I at 38).

rightfully belongs to him. *Knudson*, 534 U.S. at 213. For an accounting or disgorgement of profits, he still must show that Great-West possesses particular property over which he can "assert title or right to possession," though the profit generated from the property need not be contained in a specifically identifiable *res*. *See id.* at 213, 214 n.2.

Great-West may possess such "particular property," but Mr. Teets failed to identify any such property in his response to Great-West's summary judgment motion. *Id.* at 213. In its motion, Great-West argued that the report prepared by Mr. Teets's damages expert showed that Mr. Teets sought "as damages the margin on Great-West's general account assets." Aplt. App., Vol. II at 182. Great-West asserted that Mr. Teets "[could not] point to any evidence that Great-West's general account investment returns form a specifically-identifiable *res* that properly can be traced to any plan." *Id.* at 183. In response, Mr. Teets did not attempt to identify the funds in Great-West's possession that rightfully belonged to him—that is, the funds that generated the unlawful profits he sought to recover. Instead, he made a legal argument that "disgorgement of profits does not require the recovered funds to be traceable to a *res* or particular funds." *Id.* at 318. As explained below, his legal argument was wrong.

As a result, the district court was left to guess what particular property Mr. Teets would assert (1) rightfully belonged to him and (2) was used to generate unlawful profits. It might have been, to borrow Great-West's phrasing, the "amounts [participants] contributed to the plans," which are "automatically credited to the accounts of individual participants." *Id.* at 167. Or it might have been, as the district court assumed, "the margin Defendant earned on Fund contributions." Aplt. App., Vol. I at 103. It could also

51

have been any "compensation" Great-West retained beyond an amount that was "reasonable" in relation to its services under ERISA § 408(b). *See* Aplt. Br. at 45-50; 29 U.S.C. § 1108(b)(2). But Mr. Teets neither identified the property or *res* nor explained why it would qualify for equitable relief.

### d. *Mr. Teets's arguments fail*

Mr. Teets's primary argument, both in the district court and on appeal, *see* Aplt. App., Vol. II at 318, is that ERISA does not require him to point to a specific *res* to be eligible for disgorgement as an equitable remedy. First, he contends that *Salomon* "endorsed" disgorgement of profits as an equitable remedy under ERISA. Aplt. Br. at 51-52. Second, he argues that trust law treatises and restatements confirm that accounting and disgorgement of profits are equitable remedies, even without an identifiable *res*. *Id.* at 52-53. He states, "[W]hen a third-party transferee takes with knowledge of the breach"—here, when Great-West participates in a prohibited transaction—"'the seller takes the purchase money subject to the trust and can be compelled to restore it.'" *Id.* at 52 (quoting Austin W. Scott & William F. Fratcher, *Law of Trusts* § 291.1 (4th ed. 1989)). Furthermore, under such a framework, if "the transferee has disposed of the property, the beneficiary can charge him with *the value* of the property." *Id.* (quoting Scott & Fratcher, § 291.2); *accord* Restatement (Second) of Trusts § 291 (Am. Law Inst. 1959). Mr. Teets thus contends that he may sue Great-West for any funds Great-West obtained through its participation in a prohibited transaction, including profits, and can recover a "*money judgment* as to the balance," even if it is not

52

identifiable. Aplt. Br. at 53 (quoting George G. Bogert, George T. Bogert & Amy Morris Hess, *Law of Trusts & Trustees* § 868 (2018)).

Mr. Teets's argument overlooks how the Supreme Court has limited the remedies available under § 502(a)(3). As stated above, the fact that equity courts at common law could award a particular remedy does not mean the remedy is necessarily equitable for purposes of ERISA. Rather, "legal remedies—even legal remedies that a court of equity could sometimes award—are not 'equitable relief' under§ 502(a)(3)." *Montanile*, 136 S. Ct. at 661.

Mr. Teets relies on authorities that discuss what remedies an equity court could award for a breach of trust, not whether those remedies are legal or equitable in nature. As the *Salomon* Court stated:

> [W]hen a trustee in breach of his fiduciary duty to the beneficiaries transfers trust property to a third person, the third person takes the property subject to the trust . . . . The trustee or beneficiaries may . . . maintain an action for restitution of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom.

530 U.S. at 250. But unless the profits Mr. Teets seeks to recover were generated from particular property over which Mr. Teets can "assert title or right to possession," *Knudson*, 534 U.S. at 213, an order to disgorge them is a legal remedy, even if a court sitting in equity would have had jurisdiction to order that remedy. And a legal remedy is not allowed under § 502(a)(3).

Mr. Teets also argues that his attempt to recover from the commingled profits in Great-West's general account does not bar equitable relief. This assertion, however,

53

skips a critical step to establish appropriate equitable relief under § 502(a)(3)—namely, identifying the property that Great-West has commingled with its other assets. He has not specified the assets he alleges were commingled with Great-West's general account to generate the profits he seeks to disgorge, which is fatal to his claim under § 502(a)(3). *See In re Unisys Corp.*, 579 F.3d at 238 (holding that because "plaintiffs [were] unable to identify 'money or property . . . belonging in good conscience' to them and clearly 'trace[able] to particular funds or property in the defendant's possession,' they [could not] recover profits from [defendants] as a form of equitable relief." (second and third alterations in original) (citation omitted) (quoting *Knudson*, 534 U.S. at 213)). As a result, summary judgment was proper.

## III. **CONCLUSION**

Great-West was entitled to summary judgment on both the fiduciary and non-fiduciary claims. Because Mr. Teets has not provided evidence that contractual restrictions on withdrawal from the KGPF actually constrained plans or participants, Great-West does not act as an ERISA fiduciary when it sets the KGPF's Credited Rate each quarter. As a result, it also lacks sufficient authority or control over its compensation to render it a fiduciary. As to liability as a party in interest, Great-West

was entitled to summary judgment because Mr. Teets failed in the district court to carry

his burden of showing that the relief he sought was equitable.[32]

---

[32] Because we affirm the grant of Great-West's summary judgment motion, we also conclude the district court properly denied Mr. Teets's motion for summary judgment. *See Phila. Indem. Ins. Co. v. Lexington Ins. Co.*, 845 F.3d 1330, 1336 n.4 (10th Cir. 2017).

We grant the parties' motions to seal their appellate briefs and appendices in light of their submission at the court's request of publicly-available redacted versions of those filings.

*Teets v. Great-West Life & Annuity Insurance Co.*, No. 18-1019
**BACHARACH**, J., concurring.

I join virtually all of the majority's thoughtful and persuasive opinion. I respectfully disagree only with the majority's analysis in Part II(A)(3)(a)(ii), which discusses the policy that allegedly prohibits plan sponsors from offering other low-risk funds alongside Great-West's own Key Guaranteed Portfolio Fund ("KGPF"). *See* Maj. Op. at 29–32. Although I agree that Great-West is entitled to summary judgment on these claims, I do not believe that Mr. Teets bore the burden to present the evidence discussed in the majority opinion.[1]

**1. Mr. Teets had no burden to allege specific facts to counter a basis for summary judgment that Great-West had not raised.**

The majority reasons that Mr. Teets failed to set forth specific facts showing that participants had been forced to accept a credited interest rate or had felt locked into the KGPF. But Great-West had not moved for summary judgment on this basis.

A nonmovant opposing summary judgment is "obligated only to present evidence opposing the arguments made in the respondents'

---

[1] The majority also notes that Mr. Teets can point to no case "in which a court has deemed a service provider to be a fiduciary based on participants' lack of alternative investment options, or on anything other than imposing a penalty or fee for withdrawal." Maj. Op. at 31. I too have found no such case. But I also have not found any cases rejecting participant choice as a theory of liability. So this appears to be a question of first impression. The absence of case law on this theory suggests only that it is novel, not that it should be rejected.

summary judgment motion." *Bonney v. Wilson*, 817 F.3d 703, 710 (10th Cir. 2016). This obligation arises only when the nonmovant is "alerted by the [moving party] below that such evidence had to be shown in order for her to avoid summary judgment." *Tavery v. United States*, 32 F.3d 1423, 1427 n.5 (10th Cir. 1994); *see id.* ("When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B—a ground the movant might have presented but did not." (quoting *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir. 1989))). When a nonmovant lacked such an obligation in district court, it is "unfair" to rely on the absence of supporting evidence as a basis for summary judgment. *Bonney*, 817 F.3d at 710. To do so would amount to an entry of summary judgment *sua sponte*, which is appropriate only when the non-moving party was "on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).

I don't think that Mr. Teets received such notice. In its motion for summary judgment, Great-West did not argue that Mr. Teets lacked evidence that he or other participants had felt restricted or that they would have invested in alternative low-risk funds but for Great-West's non-compete policy. Great-West instead urged

- the absence of a contractual provision that prohibited the offering of competitive funds (*see* Appellant's App'x, vol. II, at 353) and

2

- a marketplace theory of nonliability (that plan sponsors—not Great-West—are responsible for choosing the funds to offer) (*id.* at 155).

Thus, I would not fault Mr. Teets for failing to present evidence on how the non-compete policy had affected participants' behavior.

**2.      Great-West does not incur a fiduciary duty based on the plan sponsor's decision to offer the KGPF even if the plan sponsor's decision would have prevented the offering of competitive funds.**

I would instead affirm the grant of summary judgment based on Great-West's marketplace theory of nonliability. In advancing this theory, Great-West argued that although it could decide on the terms that it would be "willing to offer an investment product, it [could not] compel the plan to accept the investment option on those terms over alternatives available in the marketplace." Appellant's App'x, vol. II, at 160. As a result, Great-West contended that it could not incur a fiduciary duty for a plan sponsor's decision to offer the KGPF rather than competing funds.

I agree with Great-West. As alleged by Mr. Teets, the policy serves only to prevent plan sponsors from offering the KGPF if competing funds are also offered;[2] the alleged policy does not affect the availability of Great-West's general investment platform if the plan sponsor had chosen to offer competing funds in lieu of the KGPF. So if plan sponsors decide that

---

[2]      Although the record does not reveal the origin of the non-compete policy, Mr. Teets has not alleged that Great-West imposes the policy without the plan sponsors' knowledge and consent.

the KGPF is uncompetitive because of its credited interest rate or the non-compete policy, plan sponsors can freely replace the KGPF with other comparable investment options.

Mr. Teets responds that Great-West acts as a fiduciary because he cannot personally choose between the KGPF and other competing low-risk funds. But this response blames Great-West for the decision-making of Mr. Teets's plan sponsor. Plan sponsors need not offer participants (1) multiple funds in the same asset class or (2) any stable-value fund.[3] Thus, Mr. Teets's theory assumes that plan sponsors would choose to offer competing funds in the absence of the alleged policy.

Even if this theory were otherwise valid, Mr. Teets has not alleged that his plan sponsor would make this choice. Great-West urged summary judgment by asserting that plan sponsors are solely responsible for choosing appropriate portfolios and that Mr. Teets's plan sponsor had selected the funds based on "independent recommendation and/or evaluation." Appellant's App'x, vol. II, at 155. In response, Mr. Teets contended that his plan sponsor couldn't offer competing funds alongside

---

[3]     In a regulation interpreting ERISA, the Department of Labor defines plan sponsors' responsibility to offer at least three investment options with "materially different risk and return characteristics" that "enable the participant or beneficiary by choosing among them to achieve a portfolio with aggregate risk and return characteristics at any point within the range normally appropriate for the participant or beneficiary." 29 C.F.R. § 2550.404c-1(b)(3)(i)(B).

the KGPF, but this contention does not address whether his plan sponsor wanted to offer competitors' funds.

Mr. Teets assumes that plan sponsors would act as he wishes; but plan sponsors are not parties, and Mr. Teets points to no evidence that Great-West influences plan sponsors' selection of investments. Mr. Teets has thus failed to set forth specific facts contesting Great-West's argument for summary judgment based on a marketplace theory of nonliability. *Celotex Corp.*, 477 U.S. at 324.

Mr. Teets instead complains that his plan sponsor offered the KGPF by itself rather than include other competitive funds. But Great-West cannot become a fiduciary based on the plan sponsor's selection of investment options. I would thus reject Mr. Teets's effort to pin fiduciary status on Great-West's conditioning of its offer to the plan sponsor.