PUBLISH

**June 11, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LORRAINE M. RAMOS;
CONSTANCE R. WILLIAMSON;
KAREN F. MCLEOD; ROBERT
MOFFITT; CHERLENE M.
GOODALE; LINDA ANN HEYRMAN;
DELRI HANSON, individually and as
representatives of a class of plan
participants, on behalf of Banner Health
Employees 401(k) Plan,

      Plaintiffs-Appellants,

    v.

BANNER HEALTH; BANNER
HEALTH BOARD OF DIRECTORS;
BANNER HEALTH RETIREMENT
PLANS ADVISORY COMMITTEE;
LAREN BATES; WILFORD A.
CARDON; RONALD J. CREASMAN;
GILBERT DAVILA; PETER S. FINE;
SUSAN B. FOOTE; MICHAEL J.
FRICK; MICHAEL GARNREITER;
BARRY A. HENDIN; DAVID
KIKUMOTO; LARRY S. LAZARUS;
STEVEN W. LYNN; ANNE MARIUCCI;
QUENTIN P. SMITH, JR.;
CHRISTOPHER VOLK; CHERYL
WENZINGER; BRENDA SCHAEFER;
CHARLES P. LEHN; COLLEEN
HALLBERG; DAN WEINMAN;
DENNIS DAHLEN; ED NIEMANN, JR.;
ED OXFORD; JEFF BUEHRLE;
JENNIFER SHERWOOD; JULIE
NUNLEY; MARGARET DEHAAN;
PATRICIA K. BLOCK; PAULETTE

No. 20-1231

FRIDAY; RICHARD O. SUTTON;
ROBERT LUND; THOMAS R.
KOELBL,

      Defendants-Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:15-CV-02556-WJM-NRN)**

---

Sean E. Soyars (Jerome J. Schlichter, Troy A Doles, and Heather Lea with him on the briefs) Schlichter, Bogard & Denton, St. Louis, Missouri, for Appellants.

Michael B. Kimberly (Margaret H. Warner, Jennifer B. Routh, and Matthew A. Waring with him on the brief), McDermott Will & Emery, Washington, D.C., for Appellees.

---

Before **TYMKOVICH**, Chief Judge, **KELLY**, and **PHILLIPS**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

A class of employees who participated in Banner Health, Inc.'s 401(k) defined contribution savings plan accused Banner and other plan fiduciaries of breaching duties owed under the Employee Retirement Income Security Act. Following an eight-day bench trial, the district court agreed in part, concluding that Banner had breached its fiduciary duty to plan participants by failing to monitor its recordkeeping service

agreement with Fidelity Management Trust Company. This failure to monitor resulted in years of overpayment to Fidelity and corresponding losses to plan participants.

During the bench trial, the employees' expert witness testified the plan participants had incurred over $19 million in losses stemming from the breach. But having determined the expert evidence on losses was not reliable, the court fashioned its own measure of damages for the breach. The court calculated damages of about $1.6 million and awarded prejudgment interest calculated at the Internal Revenue Service's underpayment rate. Also, despite finding that Banner breached its fiduciary duty, the district court entered judgment for Banner on several of the class's other claims: the court found that Banner's breach of duty did not warrant injunctive relief and that Banner had not engaged in a "prohibited transaction" with Fidelity as defined by ERISA.

The class appeals the district court's findings of fact and conclusions of law. The class argues the district court adopted an improper method for calculating damages and prejudgment interest, abused its discretion by denying injunctive relief, and erred in entering judgment for Banner on the prohibited transaction claim. We AFFIRM the district court in each instance.

# I. Background

## A. Factual Background

Banner is a large non-profit healthcare system, operating primarily in Arizona and Colorado. As a benefit of employment, Banner sponsors and administers a 401(k)

individual account, defined contribution plan for its employees (the Plan). Employees

who take part in the Plan are considered plan participants. During the period of time at

issue,[1] plan participants could contribute to their individual retirement accounts and

Banner would match these contributions up to 4% of each participant's salary. The Plan

made various investment options available to plan participants. These ranged from more

to less sophisticated options based on the level of involvement a participant wanted when

investing his funds. The value of each participant's account is a function of contributions

and investment performance, minus the expenses associated with the Plan.

The Plan states that Banner "shall control and manage the operation and

administration of the Plan and make all decisions and determinations incident thereto."

Aplt. App., Vol. II at 284. Banner then delegates these responsibilities to its CEO, who

appoints and supervises a Retirement Plan Advisory Committee. The Committee

oversees the Plan's administration.

In 1999, the Committee hired Fidelity to provide recordkeeping and administrative

services to the Plan. In this role, Fidelity tracked participant contributions, maintained

investment options for participants, made service representatives available to participants,

---

[1] The district court determined that November 20, 2009 to the date of judgment represented the relevant "Class Period." The original complaint was filed on November 20, 2015. The statute of limitations for claims of breach of fiduciary duty under ERISA extend six years from "the date of the last action which constituted a part of the breach or violation" if the plaintiff did not have actual knowledge of the breach. 29 U.S.C. § 1113(1).

and filed reports on the Plan's performance with participants, Banner, and the government.  Until 2017, after this litigation began, Banner compensated Fidelity for its services through an uncapped, revenue-sharing arrangement.  Because the agreement was based on revenue-sharing, Banner paid Fidelity based upon the total number of assets in the plan.  The more assets in the plan, the more Fidelity would make.  And because the agreement was uncapped, the arrangement did not set an upper limit on how much Fidelity could make for providing services to the Plan.

Such uncapped, revenue-sharing arrangements are uncommon among Banner's peers.  While uncapped, revenue-sharing arrangements are not unheard of in compensating service providers, they are much less common than flat, per-participant fees—agreements in which the compensation does not fluctuate based on the value of the assets in a plan.  Banner's Plan is considered a "mega" plan—one with over $1 billion in assets and 10,000 participants.[2]  Typically, such large plans are able to negotiate very favorable per-participant fees.  This is because the costs associated with servicing a plan are primarily associated with the number of individual accounts rather than total assets.  And the overhead costs of servicing individual accounts levels off when a plan has many participants.  Thus, the market for service providers for mega plans was, and continues to be, very competitive.

---

[2]  In December of 2009, the plan had 23,166 participants and $1.18 billion in assets.  When Banner changed its arrangement with Fidelity in 2017, the Plan had grown to 41,416 participants and $2.25 billion in assets.

Given this level of competition in the market, it is customary for plan fiduciaries to test the market for service providers to ensure a plan is not overpaying for recordkeeping and administrative services. This is traditionally done through a "request for proposals," essentially a gathering of bids from prospective service providers. One of the committee members overseeing the Plan acknowledged that such market pricing should be done at least every five to seven years. And yet, from 1999 onward, Banner never performed a request for proposals or used any other market analysis tool to evaluate Fidelity's service fee. Rather, Banner kept the same uncapped, revenue-sharing arrangement with Fidelity for almost two decades despite a significant increase in Plan assets and participants. Between 2009 and 2016, the recordkeeping and administrative fees under the revenue-sharing arrangement ranged between $52.45 and $108.29 when calculated on a per-participant basis.

In 2012, Fidelity offered to establish a revenue credit account. This account would be funded by reimbursements from Fidelity's revenue-sharing proceeds and could be used by Banner to pay expenses related to the Plan. Banner accepted this arrangement and established the account within the next year. Fidelity and Banner agreed the amount of the revenue credit would be "based on the Plan characteristics, asset configuration, net cash flow, fund selection and number of participants." Aplt. App., Vol. VIII at 2034. Fidelity selected the initial revenue credit amount, with at least some input from Banner. *See id.*, Vol. IV at 978 ("[Fidelity] had offered 350,000 and we wound up getting

[700,000], so apparently we asked something."). Fidelity's payments to the revenue credit account continued until 2017, when Banner reached a new fee arrangement with Fidelity at an annual rate of $42 per participant.

## B. District Court Proceedings

The named plaintiffs represent a class of current and former participants in the Plan who sued Banner and other fiduciaries of the Plan, claiming violations of ERISA, 29 U.S.C. § 1101 *et seq*. After bringing the initial complaint, plaintiffs sought and obtained certification of the following class: "All participants and beneficiaries of the Banner Health Employees 401(k) Plan from November 20, 2009 through the date of judgment, excluding the Defendants." *Id.*, Vol. II at 272–73. Relevant to this appeal, the class alleged that Banner had breached its duty of prudence by allowing Fidelity to collect excessive recordkeeping and administrative fees, *see* 29 U.S.C. § 1104(a), and had engaged in prohibited transactions with Fidelity, *see id.* § 1106(a). The class sought damages for Plan losses and appropriate injunctive relief to prevent any further violations of ERISA.

Before trial, the class presented the proposed testimony of an expert witness, Martin Schmidt. Schmidt was to testify regarding the excessive recordkeeping fees and also offer an estimate of corresponding losses to the Plan. Banner filed a motion to exclude Schmidt's testimony, which the district court denied. But the district court explained it was retaining the ability to exclude Schmidt's evidence later. *See* Aplt. App.,

Vol. II at 336 ("The Court declined to exclude Schmidt's testimony under Rule 702, given that it retained the ability to effectively arrive at the same place after receiving all the evidence relevant to this question at trial.").

The class's claims proceeded to an eight-day bench trial. After hearing from witnesses and experts, the district court issued its findings of fact and conclusions of law. The court concluded that Banner's uncapped, revenue-sharing agreement with Fidelity did not constitute a prohibited transaction under ERISA. The court did determine, however, that Banner had breached its duty of prudence by failing to monitor Banner's service agreement with Fidelity and that this breach resulted in losses to the Plan.

Schmidt testified that class members had suffered $19.4 million in losses because of Fidelity's excessive service fee. But the district court refused to rely on Schmidt's proposed calculation of damages. The court declined to credit his testimony "because his opinion is based on vague and insufficient references to his experience in the 401(k) plan industry." *Id.* at 386. Still, having found Banner breached its fiduciary duties under ERISA, the district court concluded "it is incumbent [on the court] . . . to determine an appropriate remedy for a breach of fiduciary duty resulting in a loss." *Id.* Based on its review of the records, the court chose to use the revenue credits Fidelity paid to Banner to approximate the extent of the excessive recordkeeping fees. Thus, the court found no

damages from 2012 to 2016, when Fidelity was paying into the revenue credit account.[3]

For the period of time before the revenue credit account was set up, the court used an

average of the revenue credits to project damages from 2009 to 2012. Using this average,

the district court calculated damages of $1,661,879.83.

The district court also permitted the class to recover prejudgment interest on this

amount to approximate the lost investment opportunity of funds that otherwise would

have remained in the Plan. After surveying various options for calculating interest, the

court chose to use the IRS underpayment rate as defined in 26 U.S.C. § 6621. For May of

2020, this rate was 3.25%. The court found that this rate "reasonably approximates the

lost earning investment opportunity." *Id.* at 387.

## II. Analysis

The class brings four arguments on appeal: (1) the district court erred by using

Fidelity's revenue credit account payments to estimate losses; (2) the district court abused

its discretion in selecting the IRS underpayment rate to calculate prejudgment interest;

(3) the district court misinterpreted ERISA in concluding the service agreement between

Banner and Fidelity was not a prohibited transaction; and (4) the district court abused its

discretion by denying the class injunctive relief.

---

[3] The court awarded some damages from this time period because Banner did not properly account for all of the payments made from the revenue credits back to Banner for expenses associated with maintaining the Plan. Neither party appeals this aspect of the district court's decision.

We affirm the district court on each of these issues. As explained below, the district court operated well within its purview in calculating damages and prejudgment interest. We also agree with the district court that a run-of-the-mill agreement for recordkeeping services does not constitute a prohibited transaction under ERISA. And the district court properly exercised its discretion in denying injunctive relief.

### A.  Standard of Review

Following a bench trial, the district court must state the basis for its findings of fact and conclusions of law. Fed. R. Civ. P. 52(a) ("In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately."). This requirement ensures that we "ha[ve] an adequate basis for review." *FTC v. Kuykendall*, 371 F.3d 745, 763 (10th Cir. 2004). When calculating damages, the district court must give adequate reasons to support the amount it awards. *See id.*

We review the district court's findings of fact for clear error and its conclusions of law de novo. *See Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1183 (10th Cir. 2009). A factual finding is clearly erroneous if there is no support for it in the record or "we are left with a definite and firm conviction that a mistake has been made." *Id.* (internal quotation marks omitted). When reviewing factual findings, we must "view the evidence in the light most favorable to the district court's ruling and must uphold any district court finding that is permissible in light of the evidence." *Id.*

We review a district court's award of prejudgment interest, exclusion of expert testimony, and denial of injunctive relief for abuse of discretion. *See Weber v. GE Group Life Assur. Co.*, 541 F.3d 1002, 1016 (10th Cir. 2008) (prejudgment interest); *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009) (expert testimony); *Combs v. Shelter Mut. Ins. Co.*, 551 F.3d 991, 1002 (10th Cir. 2008) (injunctive relief). "An abuse of discretion occurs when a trial court's decision is arbitrary, capricious, whimsical, or manifestly unreasonable." *Jensen v. W. Jordan City*, 968 F.3d 1187, 1200 (10th Cir. 2020), *cert. denied*, 2021 WL 1951836 (May 17, 2021) (internal quotation marks omitted). We will not disturb the district court's decision without a "firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (internal quotation marks omitted).

### B. ERISA

Before addressing the specific issues on appeal, a brief overview of ERISA's purpose and structure will help frame the disputed questions.

Through ERISA, Congress intended to "protect employees against mismanagement of their benefits plans." *Teets v. Great-West Life & Annuity Ins. Co.*, 921 F.3d 1200, 1206 (10th Cir. 2019). The statute grants this protection by "commodiously impos[ing] fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive." *Id.* (internal quotation marks omitted).

To further this goal, ERISA requires that fiduciaries discharge their duties with prudence. *See* 29 U.S.C. § 1104(a). And it prevents fiduciaries from engaging in transactions that could be detrimental to Plan participants. *Id.* § 1106(a). To enforce these fiduciary duties, ERISA empowers plan participants to bring civil suits against fiduciaries who breach their duties. *Id.* at § 1132(a)(1). If a court finds a breach of fiduciary duties, it has wide leeway to fashion remedies to make plan participants whole. *See id.* § 1109(a).

### 1. Damages and Prejudgment Interest

In developing the remedies for violations of ERISA, "Congress intended the federal courts to draw on principles of traditional trust law." *Eaves v. Penn*, 587 F.2d 453, 463 (10th Cir. 1978). And trust law "provides for broad and flexible equitable remedies in cases involving breaches of fiduciary duty." *Id.* Thus, ERISA directs courts to award damages to compensate for losses a plan sustains due to a breach. 29 U.S.C. § 1109(a) (explaining plan participants are entitled to "any losses to the plan resulting from each such breach"). The statute itself does not prescribe how courts are to measure loss, but we have previously identified several appropriate measures: "In addition to specific remedies for recovery of profits obtained by fiduciaries by use of plan assets, trust law provides the alternative remedy of restoring plan participants to the position in which they would have occupied but for the breach of trust." *Eaves*, 587 F.2d at 462. In choosing the remedy, "the court has a duty to enforce the remedy which is most

advantageous to the participants and most conducive to effectuating the purposes of the trust." *Id.*

But determining the damages arising from a breach of fiduciary duty can often be difficult. For instance, there is no easy way to determine the extent of a loss from a breach that may have been diffuse and spread out across time or the extent of a loss resulting from lost investment opportunities. So, the plaintiff need not provide a perfect estimate of how much loss the breach caused. *See Eaves*, 587 F.3d at 463 ("The law clearly permits approximations as the extent of the damage, so long as the fact of damage or 'lost profit' is certain.").

If a district court finds a breach of fiduciary duties but rejects a plaintiff's proposed measure of damages, the court may fashion its own measure of loss resulting from the breach. *See Donovan v. Bierwirth*, 754 F.2d 1049, 1055 (2d Cir. 1985). When a district court undertakes such a calculation of damages, we give it considerable discretion. *See Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1047 (9th Cir. 2001) ("When precise calculations are impractical, trial courts are permitted significant leeway in calculating a reasonable approximation of the damages suffered.").

If a court determines a fiduciary breached its duty to a plan, it also has discretion to award the plaintiffs prejudgment interest. *See Weber v. GE Group Life Assur. Co.*, 541 F.3d 1002, 1016 (10th Cir. 2008) (internal quotation marks omitted). Prejudgment interest is intended to make the plaintiffs whole, not to punish the fiduciary. *See Caldwell*

-13-

*v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1287 (10th Cir. 2002) ("The policy that underlies awarding prejudgment interest seeks to make persons whole for the loss suffered because they were denied use of money to which they were legally entitled.").

We now turn to the class's various arguments about why the district court's calculation of damages is factually and legally flawed. A district court's award of damages is a factual finding we review for clear error. *Sw. Stainless*, 582 F.3d at 1183. But we review de novo the court's methodology in calculating damages, "such as determining the proper elements of the award or the proper scope of recovery." *Id.*

### i. Schmidt's Testimony

First, the class contends the district court abused its discretion by excluding its expert's testimony on damages. Schmidt acted as an expert for the class, testifying as to the existence of a breach and the extent of damages. To estimate damages, Schmidt projected a range of appropriate recordkeeping fees for each year in question, selected a fee from these ranges for each year, and then measured the difference between his chosen fee and what Banner actually paid Fidelity.

Prior to trial, Banner brought a motion to exclude Schmidt's expert testimony. Under Federal Rule of Evidence 702, a district court "must satisfy itself that the proposed expert testimony is both reliable and relevant" before admitting that testimony for trial.

*United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006). The district

court denied that motion and allowed Schmidt to testify.[4]

But, after trial, the court decided portions of Schmidt's testimony were unreliable.[5]

While the court found Schmidt helpful in identifying the underlying breach, it rejected

Schmidt's testimony on damages. In doing so, the court reasoned that "Schmidt relied

almost exclusively on his unquantifiable and non-replicable experience for his damages

estimates, a process which the Court is constrained to find as unreliable." Aplt. App.,

Vol. II at 335.[6] Schmidt's reliance solely on prior experiences to calculate damages was

exacerbated by the fact that "the scant information Mr. Schmidt provided about these

---

[4] In allowing Schmidt to testify, the court recognized that "a judge conducting a bench trial maintains greater leeway in admitting questionable evidence, weighing its persuasive value upon presentation." *See Tyson Foods*, 565 F.3d at 780.

[5] In *Tyson Foods*, we concluded it was not an abuse of discretion for a district court to permit an expert to testify for its own consideration and then subsequently find the expert's testimony unreliable. *See* 565 F.3d at 780.

[6] The parties disagree about the proper standard to apply to a district court's decision to exclude expert evidence after a bench trial. The class argues this decision should be subject to the abuse of discretion standard traditionally applied to decisions about the admissibility of expert testimony made prior to trial. Banner, however, contends we cannot second-guess the district court's decision to reject Schmidt's testimony. Aple. Br. at 24–25 ("Because this aspect of the district court's decision rests at least in part on its assessment of Schmidt's live testimony, moreover, its conclusion that Schmidt was not reliable or credible is entitled to nearly insurmountable deference."). Because we conclude the district court's decision to exclude Schmidt's testimony on damages was not an abuse of discretion, we need not determine whether expert testimony excluded after a bench trial is entirely immune from review.

other experiences . . . does not allow the Court to meaningfully assess and consider whether the quality and service of the recordkeeper services provided to these comparator plans were on par with . . . services provided by Fidelity to the Plan." *Id.* at 334–35.

The class argues the district court abused its discretion in three ways in rejecting Schmidt's damages testimony: (1) by applying an incorrect legal standard for assessing Schmidt's testimony, (2) by failing to acknowledge that Schmidt had a methodology supporting his damages calculation, and (3) by basing its decision on inconsistent factual findings.

The class insists the district court held Schmidt's testimony to an unnecessarily high standard. Because damages under ERISA are necessarily imprecise, the class argues the district court should have deemed Schmidt's experience-based calculations reliable.

While the class is correct that damage calculations under ERISA are often imprecise, this principle of ERISA damages does not relieve an expert of demonstrating that his calculations are based on a reliable methodology. The class has directed us to no cases suggesting the standards for assessing expert evidence are relaxed in the context of ERISA. Instead, the rules of evidence remain the same, demanding that expert testimony be "the product of reliable principles and methods." Fed. R. Evid. 702(c); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993). Here, Schmidt identified various factors he relied on in coming up with his estimate, including the Plan's size, services provided to the Plan, and the number of other recordkeepers that could

perform those services. But when pressed on how he extrapolated from those factors to the specific fees he proposed, he could only invoke vague allusions to his "experience." *See, e.g.*, Aplt. App., Vol. III at 603 ("[I]n determining what the fee would be . . . I looked at what . . . services . . . were included within the plan and then based on my experience, and you know, what would be a part of this, these would be the fees . . . that I determined would be charged for this particular plan.").

The district court determined that while experience might be an adequate methodology to support expert testimony in some instances, it was not enough to make Schmidt's damages calculation reliable. Instead, the district court agreed with one of Banner's experts, who testified that "Mr. Schmidt has not provided any support for those numbers. So I have no bases to go back and check whether the numbers he is advocating are correct or not." *Id.*, Vol. V at 1327. Without any replicable method underlying Schmidt's estimates, the district court concluded it could not determine whether his approximations were reliable. The district court did not abuse its discretion in coming to this conclusion. *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1237–38 (2005) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.") (internal quotation marks omitted).[7] Though it is appropriate for the proposed

---

[7] The court also discounted Schmidt's testimony because, after calculating fee ranges for the years in question, Schmidt selected the lowest fee in each range
(continued...)

damages to be approximations, the requirements of Rule 702 are not relaxed in ERISA

cases.

The class also argues the district court overlooked Schmidt's reliance on specific

comparators in forming his damages calculation. The class specifically refers to two

other mega plans—A and B—that Schmidt relied on in coming to his estimates. Based

on Schmidt's reliance on these plans, the class maintains he had hard data guiding his

calculation of damages and thus the district court improperly rejected his damages

recommendation.

The district court did not ignore these other plans, though. It acknowledged that

Schmidt had presented data about Plans A and B during his testimony. But the court

determined it would not evaluate these plans as part of Schmidt's methodology because

Schmidt himself had disclaimed using the plans to estimate the appropriate fees for

Banner's agreement with Fidelity. *See* Aplt. App., Vol. XIII at 3341 (testifying "the term

sheets [from A and B] were provided as an example of my experience; not information

that I relied on to form my opinion related to the Banner Plan"). And even if the court

---

[7](...continued)
to determine damages. The court did not abuse its discretion in doing so.
Schmidt himself acknowledged any of the fees within his proposed range would
be reasonable and he could not provide a specific reason for choosing the lowest
possible fee to calculate damages. *See* Aplt. App., Vol. III at 660 ("I assigned a
number that I felt was reasonable based on the characteristics of the plan from
what I was looking at.").

-18-

could consider the plans, it concluded the information from just two out of over four thousand comparable mega plans did not render Schmidt's opinion reliable.

Finally, the class contends the district court abused its discretion by relying on inconsistent factual findings in excluding Schmidt's testimony. The class highlights three examples. First, the district court found Schmidt's testimony unreliable in part because Schmidt did not meaningfully compare the quality of services provided by Fidelity to that of other plans. But, according to the class, the record contained plenty of evidence to use for comparisons. Second, the class argues it was improper for the district court to even require such comparative evidence because the court regarded recordkeepers as fungible. And, third, the class argues it was improper for the district court to accept Schmidt's testimony for one purpose (crediting his testimony as to the finding on breach) but not for another (refusing to consider his testimony on the extent of damages flowing from that breach).

The record simply does not bear out the class's arguments. As explained above, Schmidt disclaimed reliance on the two most relevant comparators—Plans A and B—in calculating damages. Many of the other experiences Schmidt cited came in the context of smaller plans and Schmidt made no effort to compare these plans to Banner's Plan. Thus, the court did not abuse its discretion in determining there was a lack of evidence to engage in meaningful comparison across plans. And while the court did consider recordkeepers "fungible, to a degree," Aplt. App., Vol. II at 317, this finding did not

compel the court to mechanically use other service agreements as comparators for

Banner's agreement with Fidelity. It was entirely reasonable for the court to expect

Schmidt to explain how the other service providers measured up against Fidelity to

determine an appropriate fee range.

Finally, the court did not abuse its discretion by accepting some parts of Schmidt's

expert testimony while rejecting others. The district court found Schmidt's experience

adequate to make his opinion as to breach reliable but concluded the experience was

inadequate to support Schmidt's specific damages calculation. There is nothing

inconsistent about these findings. Expert testimony is not an all-or-nothing proposition.

The fact that an expert's opinion on one issue is admissible does not mean all his

proposed opinions are admissible. Here, the court deemed Schmidt's experience

sufficient to render his testimony on a breach reliable, but not adequate to support his

opinion about damages. We find no abuse of discretion in the court accepting Schmidt's

testimony in finding a breach, but not for calculating damages.

### ii. Calculating damages

Having excluded Schmidt's testimony on damages, the district court considered

"multiple alternatives measures" and ultimately "determined that the revenue credits that

Fidelity actually paid back to Banner are the best estimate of the excess fees the Plan paid

in the first instance." Aplt. App., Vol. II at 338. The court explained "the revenue credit

may be viewed as the amount that Fidelity itself considered to be excessive recordkeeping

-20-

and administrative fees, and should be allocated back to Banner for payment of administrative Plan costs." *Id.*

The class argues that even if the district court properly excluded Schmidt's testimony, it erred when crafting its own measure of damages. The class takes issue with the district court's selection of the revenue credits in two ways: (1) the district court failed to provide sufficient reasons for choosing the revenue credits to measure damages, leaving this court without an adequate record for review, and (2) the district court's choice of the revenue credit amount is factually flawed.

First, the class argues that remand is warranted because the district court fell short of the requirements of Rule 52(a) of the Federal Rules of Civil Procedure. *See Kuykendall*, 371 F.3d at 763 (explaining that under Rule 52(a) the district court must "set forth clear reasons for its findings so this court has an adequate basis for review"). Specifically, the class notes that while the district court claims to have considered "alternative measures," it did not describe what these alternatives were or why the revenue credits better approximated Banner's overpayments. Like many a math teacher, the class faults the district court for not adequately showing its work.

We disagree with the class. The district court provided more than enough reasoning for us to evaluate its decision. Specifically, the court identified that the agreement instituting the revenue credits made clear the credits were to be "based on the Plan characteristics, asset configuration, net cash flow, fund selection[,] and number of

-21-

participants." Aplt. App., Vol. II at 338. And, contrary to the class's argument, the district court was under no obligation to go through and explain why it declined to use all other conceivable measure of damages found in the record. The court considered and rejected the only other measure of damages the class proposed at trial—Schmidt's calculations based on his experience—because it was not grounded in a reliable methodology. Left without the benefit of party presentation on any other measure of damages, the court selected a measure of loss and explained its choice.

But the class contends that even if the district court fulfilled its obligations under Rule 52(a), the court's reasoning for selecting the revenue credits was unsound. The class insists the court failed to establish a connection between the revenue credits and the Plan's overpayments to Fidelity. Thus, the district court's finding that Fidelity *may* have viewed the revenue credits as representing excessive fees was pure conjecture. Without evidence of meaningful negotiation about the revenue credits, the class maintains it was inappropriate for the court to assume Fidelity had any incentive to use the revenue credits to make the Plan whole. The class also argues the district court's own findings on breach militate against using the revenue credits to measure damages. Specifically, the class points out that the court found Banner could have leveraged the Plan's growth to "negotiate more favorable recordkeeping fees for the same level and quality of recordkeeping and administrative services." Aplt. App., Vol. II at 331. And the court went on to explain that Banner's failure to negotiate "resulted in Plan Participants paying

-22-

excessive recordkeeping and administrative fees from the beginning of the Class Period through December 31, 2016." *Id.* The class insists the court's finding of breach undercuts its decision to use the revenue credits, which were part of Fidelity's arrangement with Banner during the time when the breach occurred, to calculate the true measure of loss.

We conclude the district court's decision to use the revenue credits to estimate damages was permissible. In calculating damages, the district court was not tasked with taking over for a class of plaintiffs that failed to provide adequate evidence and making their case for them. Rather, the court's sole job was to make a "reasonable approximation" of the recordkeeping losses. *Cal. Ironworkers*, 259 F.3d at 1047. On appeal, we must "view the evidence in the light most favorable to the district court's ruling and must uphold any district court finding that is permissible in light of the evidence." *Sw. Stainless*, 582 F.3d at 1183. The record reflects that the revenue credits were tied to specific Plan characteristics. Viewing this evidence in the light most favorable to the district court, the court operated well within its discretion in treating the revenue credits as a reasonable approximation of how much Fidelity was being overpaid. Furthermore, the district court's decision to use the revenue credit payments was not inconsistent with the court's finding of breach. As the court explained, though the breach continued from 2012 to 2016, there were no losses during this time because Fidelity used the revenue credits to reimburse Banner.

Having failed to adequately support its sole theory of damages, the class insists the district court was obliged to scour the record in search of a more generous theory of damages. No such obligation exists. *See United States v. Singeng-Smith*, 140 S. Ct. 1575, 1579 (2020) (explaining that parties, not courts, are "responsible for advancing the facts and argument entitling them to relief"). We affirm the district court's calculation of damages.

### iii. Selecting a prejudgment interest rate

The class raises similar arguments about the district court's selection of the IRS underpayment rate to calculate prejudgment interest: the court's chosen methodology was improper and the explanation for its choice was lacking.

After using the revenue credits to calculate damages, the district court exercised its discretion to "permit Plaintiffs to recover prejudgment interest . . . in lieu of and to approximate the lost investment opportunity of funds that would have otherwise remained in the Plan." Aplt. App., Vol. II at 344. The court first identified prejudgment interest rates prior courts had used: Colorado's statutory rate, the federal postjudgment interest rate, and the IRS underpayment rate. From these options, the court ultimately selected the IRS underpayment rate, finding that it "reasonably approximates the lost earning investment opportunity, and is not punitive to Banner." *Id.* at 387.

The class contends the district court's selection of the IRS underpayment rate was arbitrary and thus an abuse of discretion. While the class acknowledges that the district

court cited to prior cases in which courts had used the IRS underpayment rate to calculate prejudgment interest, it believes these cases are distinguishable because none involved a breach of duty under ERISA. Without a specific chain of reasoning explaining why the IRS underpayment rate makes the class whole, the class maintains the district court's choice cannot withstand scrutiny.[8]

The district court did not abuse its discretion in selecting the IRS underpayment rate. As a reminder, to find an abuse of discretion, we must have a "firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Jensen*, 968 F.3d at 1200. We have no such conviction here. While the IRS underpayment rate might be lower than several of the other possible rates the court could have chosen from, the class did not provide the court with any definitive evidence of what the Plan's rate of return was during the relevant time. And the IRS underpayment rate has been previously used in ERISA cases to measure prejudgment interest. *See Russo v. Unger*, 845 F. Supp. 124, 126 (S.D.N.Y. 1994)

---

[8] The class now advocates for the Plan's average rate of return as the appropriate prejudgment interest rate. The class raises this alternative rate for the first time on appeal. Below, the class proposed only the S&P 500 Index rate of return to calculate prejudgment interest. We will not entertain this proposal at this late hour. *See Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1271 (10th Cir. 2000) ("[W]e should not be considered a 'second-shot' forum . . . where secondary, back-up theories may be mounted for the first time." (internal quotation marks omitted)).

(collecting cases). The district court's decision to use the IRS underpayment rate was well within the realm of permissible choice.

## 2. Equitable Relief

The class next argues the district court abused its discretion by failing to give injunctive relief to prevent Banner from continuing to breach its fiduciary duties. Specifically, the class appears to be most concerned with the district court's decision not to require Banner to hold a request for proposals to test the market for recordkeeping and administrative services. The class argues Banner has not meaningfully tested the market for recordkeepers in over twenty years, so the district court should have required Banner to engage in this long overdue process.

As previously indicated, ERISA provides courts a wide array of remedial options, including injunctive relief. *See* 29 U.S.C. § 1109 (stating a fiduciary who breaches his duties "shall be subject to such other equitable or remedial relief as the court may deem appropriate"). Because ERISA imposes a high standard on fiduciaries, "serious misconduct that violates statutory obligations is sufficient grounds for a permanent injunction." *Beck v. Levering*, 947 F.2d 639, 641 (2d Cir. 1991). Still, equitable relief must be used only "to redress [a] violation or to enforce any provision" of ERISA. *See* 29 U.S.C. § 1132(a)(5).

Because the district court found Banner to have breached its fiduciary duties, it considered the class's argument for equitable relief. Ultimately, though, the court

concluded the class "failed to make any showing that injunctive or equitable relief is appropriate in the circumstances of this case." Aplt. App., Vol. II at 402. By the time of the court's judgment, Banner had ended the previous uncapped, revenue-sharing arrangement and agreed to a per-participant recordkeeping fee with Fidelity. Since Banner had ended the prior arrangement, the court found "there is simply no evidence from which the Court can reasonably conclude that Banner Defendants will at some point in time resume a policy or practice of violating their duty of prudence with respect to recordkeeping fees." *Id.* at 403. Without an impending threat that Banner's breach of fiduciary duty would continue, the court denied the class's request for injunctive relief.[9]

The class contends the court abused its discretion in denying relief because Banner's breach of fiduciary duties is ongoing. In finding a breach, the district court had found it "highly significant that Banner has not undertaken a single [request for proposals] in nearly 20 years." *Id.* at 324. No market testing occurred before Banner reached the current agreement with Fidelity, which "was proposed by Fidelity, and

---

[9] The district court also noted that the class "did not challenge the appropriateness of the recordkeeping fees paid to Fidelity after January 1, 2017." Aplt. App., Vol. II at 402. The class maintains they made no such concession and explicitly challenged the ongoing recordkeeping fees, even after Banner had changed its arrangement with Fidelity. *See id.* at 506–07 (explaining the class "would disagree . . . that our time frame ends at 2016. We have an ongoing excessive recordkeeping fee claim, even though they've changed . . . the payment structure"). This single error, however, does not amount to an abuse of discretion. The court gave other reasons for reaching its decision that are supported by the record.

accepted without apparent negotiation by Banner." *Id.* at 323. The class reasons that because Banner has still not performed a request for proposals or otherwise tested the market, Banner's breach continues.

The district court did not abuse its discretion in denying injunctive relief. Banner characterizes the court's breach finding as stemming entirely from Banner's failure to test the market. That is wrong. The court did not find a breach simply because Banner had failed to perform a request for proposals. Rather, the court found a breach of fiduciary duty because Banner failed to adequately monitor the *uncapped, revenue-sharing agreement*. Once Banner changed to the per-participant recordkeeping fee with Fidelity, the breach the court had identified ended. And without any evidence of that specific breach continuing, the court denied injunctive relief. Because the underlying fee arrangement that triggered the initial finding of breach changed, we cannot say the court's decision to deny injunctive relief was arbitrary or manifestly unreasonable.

### 3. *Prohibited Transaction*

Finally, the class argues the district court misinterpreted ERISA's ban on prohibited transactions.[10]

---

[10] Banner contends this issue is moot. The parties agree that the class's entitlement to relief on the prohibited transaction and breach of fiduciary duty claims are co-extensive. Thus, Banner argues that the district court's grant of relief to the class based on the failure to monitor means no further relief could flow from any prohibited transactions with Fidelity.

(continued...)

ERISA prohibits certain transactions between fiduciaries and third parties. *See Teets,* 921 F.3d at 1207. Specifically, ERISA prohibits a plan's fiduciary from "engag[ing] in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest." 29 U.S.C. § 1106(c). Under ERISA, a "party in interest" includes "a person providing services to such plan." *Id.* § 1002. A plan participant can sue a fiduciary who engages in such a prohibited transaction. *See id.* § 1132(a)(1).

Still, ERISA provides some exemptions from the prohibited transaction rules, thereby "allow[ing] plans to do business with parties in interest if certain conditions are met." *Teets*, 921 F.3d at 1222. Plaintiffs bear the initial burden of proving a fiduciary engaged in a prohibited transaction. If the plaintiff meets this burden, defendants then have the opportunity to prove the prohibited transaction qualifies for one of ERISA's

[10](...continued)

We disagree. *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019) ("[W]e may dismiss the case . . . only if it is *impossible* for a court to grant any effectual relief whatever to [the appellant] assuming it prevails." (emphasis added)). If we were to reverse the district court's decision on the class's prohibited transaction claim, on remand the class would be entitled to present its arguments about why relief should be greater for Banner's alleged violation of the prohibited transaction claim. The district court could hypothetically institute a different measure of damages based on this alternative theory of liability. And while the class could not recover damages *in addition to* the relief granted for Banner's breach of fiduciary duty, the class is allowed to pursue an alternative theory of judgment because it could theoretically receive a more favorable remedy *in lieu of* the relief the court originally granted. Thus, the claim is not moot. *Id.* ("For better or worse, nothing so shows a continuing stake in a dispute's outcome as a demand for dollars and cents.").

exemptions. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009). For example, while a plan usually cannot transact with a party in interest, fiduciaries are not prohibited from "[c]ontracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2)(A).

Before the district court, the class argued that Fidelity was a party in interest because Banner contracted with Fidelity to provide services to the Plan. The class further reasoned that because Fidelity was a party in interest, Fidelity's provision of services to Banner constituted a prohibited transaction under ERISA. The district court disagreed. It explained ERISA "only prohibits such service relationships with persons who are 'parties in interest' by virtue of some other relations . . . . It does not prohibit a plan from paying an unrelated party, dealt with at arm's length, for services rendered." Aplt. App., Vol. II at 391 (quoting *Sellers v. Anthem Life Ins. Co.*, 316 F. Supp. 3d 25, 34 (D.D.C. 2018)). The district court expressed concern that treating the service agreement between Fidelity and Banner as a prohibited transaction would "discourage employers from offering ERISA plans" altogether. *Id.*, Vol. II at 391 (quoting *Divane v. Nw. Univ.*, No. 16-C-8157, 2018 WL 2388118, at *10 (N.D. Ill. May 25, 2018)).

The class takes issue with the district court's interpretation of prohibited transaction under ERISA. The class argues the statute's language is clear, categorical,

and broad: "Because Fidelity is a service provider and hence a 'party in interest,' its 'furnishing of' recordkeeping and administrative services to the Plan constituted a prohibited transaction[.]" Aplt. Br. at 52. It points to statements from this court and the Department of Labor that support this expansive reading of what constitutes a prohibited transaction. *See Teets*, 921 F.3d at 1222 ("On its face, [§ 1106] covers wide swaths of plan activity."); *Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure*, 77 Fed. Reg. 5632, 5632 (Feb. 3, 2012) ("[A] service relationship between a plan and a service provider would constitute a prohibited transaction, because any person providing services to the plan is defined by ERISA to be a 'party in interest' to the plan.").[11] Based on this interpretation of § 1106, the class calls on us to reverse and

_____

[11] The DOL's passing statement suggesting that service agreements constitute prohibited transactions does not affect our analysis. Neither party invoked *Chevron*. So, we need not decide whether the DOL's statement that "a service relationship between plan and a service provider would constitute a prohibited transaction" is entitled to any deference. *Reasonable Contract or Arrangement Under Section 408(b)(2)*, 77 Fed. Reg. at 5632.

Our case law about when *Chevron* has been waived is, admittedly, unsettled. *See Aposhian v. Barr*, 958 F.3d 969, 982 n.6 (deciding *Chevron* was not waived because the parties invited its use but acknowledging "our cases are not entirely consistent as to whether such an invitation is necessary"). Here, there was *no* mention of *Chevron* by either party and thus any reliance on *Chevron* is waived. *See Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1264 n.18 (10th Cir. 2020) (deeming *Chevron* waived when the party provides a "threadbare citation" but never again mentions *Chevron* or applies it to the facts of the case). The class merely cited the DOL's regulation to bolster its own interpretation of § 1106, not to suggest we owe particular deference to the agency's interpretation of what constitutes a prohibited transaction. Therefore, we proceed with our review of the
(continued...)

remand for the district court to determine whether Banner has an affirmative defense of reasonableness under § 1108(b).

Teets does not dictate our outcome here. In Teets, this court concluded a prohibited transaction claim based on the plan's agreement with the service provider could not proceed because equitable relief could not be granted. 921 F.3d at 1223 ("If a plaintiff cannot demonstrate that equitable relief is available, the suit cannot proceed."). The Teets panel never specifically addressed the issue we now face: whether an initial agreement with a service provider constitutes a prohibited transaction. Though this court generally described the statutory framework for prohibited transaction claims, we did not address whether the service provider in that case was *actually* a party in interest. Our statement that § 1106 "covers wide swaths of plan activity," Teets, 921 F.3d at 1222, does not mean it covers *all* plan activity.

Still, the class insists the service agreement constitutes a prohibited transaction. The class's interpretation leads to an absurd result: the initial agreement with a service provider would simultaneously transform that provider into a party in interest and make that same transaction prohibited under § 1106. *See Sellers*, 316 F. Supp. at 34 (such a reading would be "circular reasoning: the transactions were prohibited because [the service provider] was a party in interest, and [the service provider] was a party in interest

---

[11](...continued)
district court's interpretation of § 1106 de novo.

because it engaged in a prohibited transaction"). Instead, we conclude that some prior relationship must exist between the fiduciary and the service provider to make the provider a party in interest under § 1106. ERISA cannot be used to put an end to run-of-the-mill service agreements, opening plan fiduciaries up to litigation merely because they engaged in an arm's length deal with a service provider. Instead, ERISA is meant to prevent fiduciaries from engaging in transactions with parties with whom they have pre-existing relationships, raising concerns of impropriety. Otherwise, a plan participant could force any plan into court for doing nothing more than hiring an outside company to provide recordkeeping and administrative services.

The Supreme Court's prior treatment of § 1106 supports our interpretation. The Court has said Congress passed § 1106 "to bar categorically a transaction that [is] *likely to injure* the pension plan." *Lockheed Corp. v. Spink*, 517 U.S. 882, 888 (1996) (emphasis added). What all prohibited transactions under § 1106 "have in common is that they generally involve uses of plan assets that *are potentially harmful* to the plan." *Id.* at 893 (emphasis added). Only certain transactions—those involving parties in interest—raise inferences of impropriety. The class has provided no evidence to show that the service agreement between Fidelity and Banner was anything less than an arm's length deal or that Fidelity had some pre-existing relationship with Banner.

In sum, we affirm the district court's entry of judgment for Banner on the class's prohibited transaction claim.

# III. Conclusion

For the foregoing reasons, we AFFIRM the district court's calculation of damages and prejudgment interest, denial of injunctive relief, and entry of judgment for Banner on the class's prohibited transaction claim.